MILWAUKEE AREA TECHNICAL COLLEGE,
Plaintiff-Appellant,

v.

FRONTIER ADJUSTERS OF MILWAUKEE,
Michael D. McNichols, Frontier Adjusters, Inc.
and American International Specialty Lines
Insurance Company, Defendants,

UNITED NATIONAL INSURANCE COMPANY, St. Paul
Travelers Insurance Company,
Defendants-Respondents.
[Case No. 2007AP1549].

MILWAUKEE AREA TECHINICAL COLLEGE,
Plaintiff-Appellant,

v.

FRONTIER ADJUSTERS OF MILWAUKEE,
Michael D. McNichols, American International
Specialty Lines Insurance Company, United
National Insurance Company and St. Paul
Travelers Insurance Company, Defendants

FRONTIER ADJUSTERS, INC. Defendant-Respondent.
[Case No. 2007AP1918].

Court of Appeals

*Nos. 2007AP1549, 2007AP1918. Submitted on briefs
April 1, 2008.—Decided April 22, 2008.*

2008 WI App 76

(Also reported in 752 N.W.2d 396.)

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *Nathaniel Cade, Jr.* and *Erin K. Dickinson* of *Michael Best & Friedrich, LLP*, Milwaukee.

On behalf of the defendants-respondents, the cause was submitted on the briefs of *Peter F. Mullaney* of *von Briesen & Roper, S.C.*, Milwaukee for *United National Insurance Company*, *Thomas N. Klug* and *Patryk Silver* of *Borgelt, Powell, Peterson & Frauen, S.C.*, Milwaukee

for *St. Paul's Travelers Insurance Company* and *Jon E. Fredrickson* of *Kravit Hovel & Krawczyk, S.C.*, Milwaukee for *Frontier Adjusters, Inc.*

Before Curley, P.J., Fine and Kessler, JJ.

¶ 1. FINE, J. Milwaukee Area Technical College appeals orders dismissing on summary judgment its claims against its insurers, St. Paul Travelers Insurance Company and United National Insurance Company, and an order dismissing on summary judgment its claims against Frontier Adjusters, Inc.[1] On our *de novo* review, we affirm.

## I.

¶ 2. This case involves theft from the College by Frontier Adjusters of Milwaukee and its former owner Michael D. McNichols. As will be explained in greater detail in Part III, Frontier Adjusters of Milwaukee was a franchisee of Frontier Adjusters, Inc. The College

---

[1] The order dismissing the College's action against United National was entered May 24, 2007. The order dismissing the College's action against St. Paul Travelers was entered on June 4, 2007. The College's notice of appeal in connection with United National and St. Paul Travelers was filed on July 6, 2007, and references the May 24, 2007, date for the orders dismissing both United National and St. Paul Travelers. This discrepancy does not affect our jurisdiction. *See* WIS. STAT. RULES 805.18(1) ("The court shall, in every stage of an action, disregard any error or defect in the pleadings or proceedings which shall not affect the substantial rights of the adverse party."); 809.84 ("An appeal to the court is governed by the rules of civil procedure as to all matters not covered by these rules unless the circumstances of the appeal or the context of the rule of civil procedure requires a contrary result.").

hired McNichols and Frontier Adjusters of Milwaukee to process the College's workers' compensation claims. Frontier Adjusters, Inc., was a party to one of the contracts.

¶ 3. Under the agreements, Frontier Adjusters of Milwaukee evaluated the College's workers' compensation claims, and was supposed to pay those that had been approved. The payments were to be made from a Frontier Adjusters of Milwaukee bank account controlled by McNichols. The College replenished the money in that account by periodically sending checks to McNichols. The College also paid to Frontier Adjusters of Milwaukee an administrative fee.

¶ 4. McNichols used his arrangement with the College to steal money that the College gave him to pay the workers' compensation claims. He did this by telling the College that he had sent checks to the health-care providers when, in reality, he had not done so. Rather, he kept the checks made out to the health-care providers in a box, unsent. He would, however, send dummy check ledgers to the College that represented that he had paid the health-care providers. The College sent the replenishment checks to McNichols based on the dummy check ledgers. McNichols put the replenishment money in the Frontier Adjusters of Milwaukee bank account and then stole that money by issuing checks from that account. McNichols described the scam in an affidavit that is part of the summary-judgment Record, explaining that the check ledgers, which he printed using a standard accounting software program, "would show only the legitimate checks I had issued from the [Frontier Adjusters of Milwaukee] Account, not the fraudulent checks" he used to siphon off the money for his own use. He signed what he called the "fraudulent checks" with his own signature and the

checks were issued to real payees. None of this was questioned by the College until it had been taken for some $1.6 million.

¶ 5. The College started this lawsuit, seeking recovery from St. Paul Travelers and United National, as well as from Frontier Adjusters of Milwaukee's franchisor, Frontier Adjusters, Inc. We first discuss the College's claims against St. Paul Travelers and United National.

## II.

▮▮▮

¶ 6. We review *de novo* a circuit court's grant of summary judgment. *Green Spring Farms v. Kersten*, 136 Wis. 2d 304, 315–317, 401 N.W.2d 816, 820–821 (1987).[2] Further, a party that has the burden of proof at trial in connection with a claim has the summary-judgment burden to show that there are genuine issues of fact that require a trial on that claim. *Transportation Ins. Co. v. Hunzinger Constr. Co.*, 179 Wis. 2d 281, 290, 507 N.W.2d 136, 139 (Ct. App. 1993). We also interpret insurance contracts *de novo*. *Rebernick v. Wausau Gen. Ins. Co.*, 2005 WI App 15, ¶ 5, 278 Wis. 2d 461, 466, 692 N.W.2d 348, 351, *aff'd*, 2006 WI 27, 289 Wis. 2d 324, 711 N.W.2d 621. We give to the language of insurance contracts its plain meaning as it would be understood by a reasonable insured. *Kremers-Urban Co. v. Ameri-*

---

[2] The College spends much effort parsing the oral decision of the circuit court in an attempt to find assertions that it argues were error. Given our *de novo* review, this is a meaningless exercise. *See State v. Waste Mgmt. of Wisconsin, Inc.*, 81 Wis. 2d 555, 564, 261 N.W.2d 147, 151 (1978) (an appellate court need not address every matter discussed).

*can Employers Ins. Co.*, 119 Wis. 2d 722, 735, 351 N.W.2d 156, 163 (1984). Contract language is ambiguous when it is "fairly susceptible to more than one construction." *Ibid.* Absent an ambiguity, we interpret all contracts as the language dictates. *Kernz v. J.L. French Corp.*, 2003 WI App 140, ¶ 9, 266 Wis. 2d 124, 134, 667 N.W.2d 751, 755. With these elemental principles in mind, we turn to the insurance policies at issue in this case.

A. *St. Paul Travelers.*

■

¶ 7. The College seeks coverage under two aspects of the St. Paul Travelers policy. The first is the coverage for "forgery or alteration" of "covered instruments." (Bolding, uppercasing, and capitalization omitted.) The second is the coverage for "computer fraud and funds transfer fraud." (Bolding, uppercasing, and capitalization omitted.) We look at these insuring agreements in turn.

i. *Forgery or Alteration.*

¶ 8. The St. Paul Travelers "forgery or alteration" insuring agreement reads, as material here:

**II. FORGERY OR ALTERATION**

We will pay for loss resulting directly from "Forgery" or alteration of, on or in "Covered Instruments" that are:

1. Made or drawn by or drawn upon you; or

2. Made or drawn by one acting as your agent; or that are purported to have been so made or drawn.

368

"Covered Instruments" is defined to mean "checks, drafts, promissory notes or similar written promises, orders or directions to pay a sum certain in 'Money.'" The College does not contend that what McNichols did is covered as a "Forgery" under the St. Paul Travelers policy.[3] Rather, it argues that there is coverage under the "alteration" aspect because McNichols sent check ledgers to the College showing purported but false payments to health-care providers. There is an insurmountable hurdle to this: the check ledgers are not "Covered Instruments" as that phrase is defined by the St. Paul Travelers policy. Additionally, the checks McNichols wrote on the Frontier Adjusters of Milwaukee account as part of his theft were not "altered": they were issued exactly as McNichols, the payer with authority over the account, intended and were signed by him using his own name and were made to real payees.

ii. *Computer Fraud.*

¶ 9. The College also seeks coverage under the following insuring clause in the St. Paul Travelers policy:

**VI. COMPUTER FRAUD AND FUNDS TRANS-FER FRAUD**

We will pay for loss of, or loss from damage to:

1. "Money", "Securities" and other property resulting directly from "Computer Fraud", and

---

[3] The St. Paul Travelers policy defines "Forgery" as "the signing of the name of another person or organization with intent to deceive; it does not mean a signature which consists in whole or in part of one's own name signed with or without authority, in any capacity for any purpose."

2. "Money" and "Securities" contained in a "Transfer Account" on deposit at a "Financial Institution" resulting directly from "Funds Transfer Fraud".[4]

---

[4] In the interest of completeness, we set out the St. Paul Travelers policy's definitions for defined words or phrases in the Computer Fraud and Funds Transfer Fraud insuring agreement (including material defined words or phrases in those definitions):

"**Banking Premises**" means the interior of that portion of any building occupied by a banking institution or similar safe depository.

"**Computer Fraud**" means "Theft" of property following and directly related to the use of any computer to fraudulently cause a transfer of that property from inside the "Premises" or "Banking Premises" to a person (other than a "Messenger") outside those "**Premises**" or to a place outside those "Premises".

"**Financial Institution**" means:

1) A banking, savings, thrift institution, or

2) A stock brokerage firm, mutual fund, liquid assets fund or similar investment institution where you maintain a "Transfer Account".

"**Funds Transfer Fraud**" means:

1) Electronic, telegraphic, cable, teletype or telephone instructions fraudulently transmitted to a "Financial Institution" directing such institution debit a "Transfer Account" and to transfer, pay or deliver "Money" or "Securities" from such "Transfer Account" which instructions purport to have been transmitted by you but were in fact fraudulently transmitted by someone other than you without your knowledge or consent, or

2) Fraudulent written instructions (other than those covered under Insuring Agreement II) issued to a "Financial Institution" directing such institution to debit a "Transfer Account" and to transfer, pay or deliver "Money" or "Securities" from such "Transfer Account" by use of an electronic funds transfer system at specified intervals or under specified conditions which instruc-

(Footnote added.) The College does not contend that there was coverage under the "Funds Transfer Fraud" aspect of this insuring agreement, but, rather, under the "Computer Fraud" subpart.

tions purport to have been issued by you but were in fact fraudulently issued, forged or altered by someone other than you without your knowledge or consent.

"**Messenger**" means you, any of your partners, "Officer-shareholder" or any "Employee" who is duly authorized by you to have care and custody of the property outside the "Premises".

"**Money**" means:

1) Currency, coins and bank notes in current use and having a face value; and

2) Travelers checks, register checks and money orders held for sale to the public.

"**Premises**" means the interior of that portion of any building you occupy in conducting your business.

"**Securities**" means negotiable and non-negotiable instruments or contracts representing either "Money" or other property and includes:

1) Tokens, tickets, revenue and other stamps (whether represented by actual stamps or unused value in a meter) in current use; and

2) Evidences of debt issued in connection with credit or charge cards, which cards are not issued by you; but does not **include** "Money".

"**Theft**" means any act of stealing.

"**Transfer Account**" means an account maintained by you at a "Financial Institution" from which you can initiate the transfer, payment or delivery of "Money" or "Securities":

1) By means of electronic, telegraphic, cable, teletype or telephone instructions communicated directly or through an electronic funds transfer system, or

2) By means of written instructions (other than those

371

¶ 10. The crux of the College's contention that there is coverage under the "Computer Fraud" subpart of Insuring Agreement VI is that McNichols used a computer to print the ledgers he sent to the College seeking reimbursement, and, also, that he used a computer to manage the Frontier Adjusters of Milwaukee bank account into which he put the College replenishment funds and from which he issued checks as part of his scheme to steal that money. We need not analyze the intricacies of the "Computer Fraud" subpart of Insuring Agreement VI and the applicable defined terms because the College's contention is blocked at its inception—the St. Paul Travelers policy specifically excludes liability for "any dishonest or criminal acts committed by any of your . . . authorized representatives whether acting alone or in collusion with other persons or while performing services for you or otherwise."[5]

¶ 11. There is no dispute that McNichols and his alter ego, Frontier Adjusters of Milwaukee, were the

---

covered under Insuring Agreement II) establishing the conditions under which such transfers are to be initiated by such "Financial Institution" through an electronic funds transfer system.

[5] The exclusion reads in full:

E. Insuring Agreement VI does not apply to:

1. Loss resulting from any dishonest or criminal acts committed by any of your "Employees," directors, trustees or authorized representatives whether acting alone or in collusion with other persons or while performing services for you or otherwise.

2. Loss in excess of $5,000 (Five Thousand Dollars) for loss of, or loss from damage to manuscripts, drawings, or records of any kind or the cost of reconstructing them or reproducing any information contained in them.

College's authorized representatives in connection with the workers' compensation matters that underlie this appeal. The College argues, however, that it never "authorized" McNichols to steal from it, and that therefore McNichols was not the College's "authorized representative." This argument is not only circular, as St. Paul Travelers points out, but would, indeed, wholly abrogate the exclusion because it could never apply; every time a representative hired by an insured stole from the insured, the theft would, obviously, not be authorized. Additionally, under the exclusion, the representative need not be even "performing services" for the insured. The College's crabbed reading of the exclusion is not justified. *See Maas v. Ziegler*, 172 Wis. 2d 70, 79, 492 N.W.2d 621, 624 (1992) ("A construction which gives reasonable meaning to every provision of a contract is preferable to one leaving part of the language useless or meaningless.").

¶ 12. The College also argues that the exclusion does not apply because it was *really* designed to prevent an insured's double recovery, pointing to a provision in the policy that promises to pay for losses caused by "Employee Theft." But no one contends that McNichols was an "employee" of the College, and, moreover, the policy has a provision that specifically prevents any possible double recovery: "If two or more Insuring Agreements of this insurance apply to the same loss, we will pay the lesser of the actual amount of the loss or the sum of the Limits of Insurance applicable to those Insuring Agreements."

¶ 13. Based on our *de novo* review, we affirm the circuit court's dismissal of the College's claims against St. Paul Travelers.

## B. *United National.*

¶ 14. The College seeks coverage under the "forgery or alteration" insuring agreement of the United National policy. The material policy provision promises that United National "will indemnify the [College] for loss involving **INSTRUMENTS** resulting directly from . . . [f]orgery or alteration of, on, or in any **INSTRUMENT**." The term "instruments" is defined to mean:

> checks, drafts, promissory notes, or similar written promises, orders or directions to pay a certain sum in money that are:
>
> (a) Made or drawn by or drawn upon the [College];
>
> (b) Made or drawn by one acting as the [College's] agent; or that are purported to have been so made or drawn.

The only definition of "instruments" that is applicable here is subpart (b); the checks at issue were drawn by McNichols on his Frontier Adjusters of Milwaukee bank account and signed by him using his own name.[6] Unlike the St. Paul Travelers policy, the United National policy does not define the word "forgery."

██

¶ 15. The checks that McNichols issued from the Frontier Adjusters of Milwaukee account for his benefit were genuine—that is, they were what they purported to be, with real payees and signed by McNichols, who, as we have seen, had the power to write checks on that account. Thus, they were not "forgeries." *See State v. Entringer*, 2001 WI App 157, ¶ 14, 246 Wis. 2d 839,

---

[6] The check ledgers that McNichols sent to the College are not "instruments" under the United National policy definitions.

846, 631 N.W.2d 651, 654 (" 'Forgery cannot be committed by the making of a genuine instrument.' ") (quoted source omitted). That the genuine instrument was made or issued to further a criminal or fraudulent scheme does not change things. *See id.*, 2001 WI App 157, ¶ 9, 246 Wis. 2d at 844, 631 N.W.2d at 653; *cf. First Am. State Bank v. Aetna Cas. & Sur. Co.*, 25 Wis. 2d 190, 196, 130 N.W.2d 824, 827 (1964) (that documents may have been part of a "false pretenses" scheme does not necessarily mean that the documents were forged). Additionally, as we have seen in the discussion of "alteration" in connection with the St. Paul Travelers policy, the checks McNichols issued on his Frontier Adjusters of Milwaukee account that were signed by him using his real name were not "alterations" of those checks. Thus, there was also no coverage under the alteration-of-instruments aspect of the United National policy.

¶ 16. Based on our *de novo* review, we affirm the circuit court's dismissal of the College's claims against United National that are at issue on this appeal.[7]

## III.

¶ 17. As already noted, this appeal comes to us on summary judgment, and, therefore, our review is *de novo*. Further, we agree with the College that it has not asserted a vicarious-liability claim against Frontier Adjusters, Inc., and that, accordingly, contrary to the circuit court's analogies, the holding in *Kerl v. Dennis Rasmussen, Inc.*, 2004 WI 86, 273 Wis. 2d 106, 682 N.W.2d 328, is not material to our analysis.

---

[7] United National paid part of the College's claim. That matter is not before us.

¶ 18. As we have seen, Frontier Adjusters of Milwaukee was a franchisee of Frontier Adjusters, Inc. There are two franchise agreements in the Record and, as material to this appeal, they are identical. First, both agreements provided that Frontier Adjusters of Milwaukee was an "independent contractor" and that it "shall have complete and absolute control in all matters involving discretion and judgment in the operation of [its] business." The franchise agreements also gave to Frontier Adjusters, Inc., the right to audit the books of Frontier Adjusters of Milwaukee:

> The Franchisor or its designated agent shall have the right and be provided by the Franchisee the opportunity at all reasonable times to examine and audit the books, records, reports, files and other materials of the Franchisee appurtenant to or incidental to the conduct of the business franchised pursuant to this Agreement. The Franchisee shall provide an opportunity and make available to the Franchisor's agent all books, records, files or other material that may be necessary or expedient in making any such examination or audit.

Of the two agreements between the College and Frontier Adjusters of Milwaukee, Frontier Adjusters, Inc., was a party to one. The only obligation Frontier Adjusters, Inc., had under that contract was to: "Produce computer reports on an agreed format and distribute these quarterly with two copies to" the College. The College does not show pursuant to its summary-judgment burden how those reports are material to the claims it asserts against Frontier Adjusters, Inc. *See Hunzinger Constr.*, 179 Wis. 2d at 290, 507 N.W.2d at 139.

¶ 19. The College's operative complaint asserted three related claims against Frontier Adjusters, Inc. First, it contended that "under the Franchise Agree-

ment," Frontier Adjusters, Inc., "had the right" to "conduct an audit of Frontier-Milwaukee's records and books" but, "[u]pon information and belief," had not done so. Second, the College also contended that under the one agreement between the College and Frontier Adjusters of Milwaukee to which Frontier Adjusters, Inc., was a party, Frontier Adjusters, Inc., "owed [the College] a duty" to "monitor and audit Frontier-Milwaukee's books and records and to supervise Frontier-Milwaukee," but had not done so. Third, the College claimed that Frontier Adjusters, Inc., breached the contract between the College and Frontier Adjusters of Milwaukee to which Frontier Adjusters, Inc., was a party by "failing to audit Frontier-Milwaukee's books and records."

¶ 20. In connection with the first claim, namely that under the franchise agreements between Frontier Adjusters, Inc., and Frontier Adjusters of Milwaukee, Frontier Adjusters, Inc., owed to the College a duty to audit the books and records of Frontier Adjusters of Milwaukee, the College was not a party to those franchise agreements. Thus, the only possible way it could seek recovery for a breach of that contract would be if it were a third-party beneficiary of that agreement. A person may enforce a contract as third-party beneficiary if the contract indicates that he or she was either specifically intended by the contracting parties to benefit from the contract or is a member of the class the parties intended to benefit. *Pappas v. Jack O.A. Nelsen Agency, Inc.*, 81 Wis. 2d 363, 371–372, 260 N.W.2d 721, 725–726 (1978). There is nothing either in the franchise agreements between Frontier Adjusters, Inc., and Frontier Adjusters of Milwaukee, or in the summary-judgment Record that even hints that the College was

an intended third-party beneficiary of the franchise agreements' audit and inspect clauses, and, indeed, the College does not contend that it was. Accordingly, the College had no right under those agreements to have Frontier Adjusters, Inc., audit or inspect the books and records of Frontier Adjusters of Milwaukee. Thus, it has no breach-of-contract claim against Frontier Adjusters, Inc., for the latter's failure to do so.

¶ 21. Further, in a heading to the breach-of-franchise-agreement claim that we have just discussed, the College's operative complaint has the following parenthetical without further elaboration or discussion: "(Negligent Hiring, Supervision and/or Negligent Retention)." Assuming without deciding that this parenthetical is an acceptable way to state claims, *see* WIS. STAT. RULE 802.02(1)(a) (A complaint must set out "[a] short and plain statement of the claim, identifying the transaction or occurrence or series of transactions or occurrences out of which the claim arises and showing that the pleader is entitled to relief."), the College has not satisfied its summary-judgment burden to show that Frontier Adjusters, Inc., was negligent in the selection of McNichols to be its Milwaukee franchisee, or negligently supervised or retained Frontier Adjusters of Milwaukee as its franchisee.

¶ 22. First, the College has pointed to nothing in the summary-judgment Record that shows that Frontier Adjusters, Inc., either knew or should have known that McNichols would be or was an unsuitable franchisee. *See L.L.N. v. Clauder*, 209 Wis. 2d 674, 699, 563 N.W.2d 434, 445 (1997) (There is liability for negligent selection or retention of an employee "only to the extent that the harm is caused by the quality of the employee which the employer had reason to suppose would be

likely to cause harm."); *Johnson v. Misericordia Cmty. Hosp.*, 99 Wis. 2d 708, 723, 301 N.W.2d 156, 164 (1981) ("The failure of a hospital to scrutinize the credentials of its medical staff applicants could foreseeably result in the appointment of unqualified physicians and surgeons to its staff."). Thus, the College's negligent selection and retention "claims" in the parenthetical fail.

¶ 23. Second, in connection with the parenthetical's reference to "Negligent Supervision," a finding of actionable negligence requires that there be a breach of the applicable standard of care. *See Miller v. Wal-Mart Stores, Inc.*, 219 Wis. 2d 250, 267–268, 580 N.W.2d 233, 241 (1998). Thus, a plaintiff that complains that a defendant breached its standard of care must show both the applicable standard of care and how that standard was breached. *See Johnson*, 99 Wis. 2d at 738, 301 N.W.2d at 171 (A negligence action against a hospital in connection with the granting of hospital privileges to a physician required a breach of "that degree of care and skill required of a hospital under like or similar circumstances."); *Lueck v. City of Janesville*, 57 Wis. 2d 254, 263, 204 N.W.2d 6, 11 (1973) (A gym teacher must " 'exercise that degree of supervision, instruction, and care which an ordinarily prudent physical education teacher would have maintained over the pupils or furnished to the pupils.' ") (quoted source omitted); *Hunzinger Constr.*, 179 Wis. 2d at 294, 507 N.W.2d at 140 (A plaintiff claiming that a defendant was negligent must submit "evidentiary material that raises a genuine issue of fact" in connection with whether a business complied with the applicable standard of care.). Simply put, it is not enough for a plaintiff to say, as the College does here, that a defendant did something or did not do something and that the plaintiff was damaged; the plaintiff must

show that what the defendant did or did not do violated an applicable standard of care. As material here, a franchisor is not liable under a "negligent supervision" theory unless it had "a right to supervise the internal operations" of the franchisee. *Coty v. U. S. Slicing Mach. Co.*, 373 N.E.2d 1371, 1375 (Ill. App. Ct. 1978). Here, the College points to nothing in the summary-judgment Record that shows that the standard of care applicable to a franchisor's relationship with an independent-contractor franchisee gives the franchisor the right to supervise the franchisee. *Cf. TCBY Sys., Inc. v. RSP Co.*, 33 F.3d 925, 929 (8th Cir. 1994) (expert testimony helped jury "understand what is reasonable in the franchise industry") (adequacy of site evaluation). Thus, the College's negligent-supervision "claim" in the parenthetical fails.

██

¶ 24. As to the College's second and third claims against Frontier Adjusters, Inc., namely that under the agreement between the College and Frontier Adjusters of Milwaukee to which Frontier Adjusters, Inc., was a party, Frontier Adjusters, Inc., had a duty to the College to either audit the books and records of Frontier Adjusters of Milwaukee or to "monitor" the latter's relationship with the College, there is nothing in the contract that imposes any obligation on Frontier Adjusters, Inc., other than its duty to, as we have seen, "[p]roduce computer reports on an agreed format and distribute these quarterly with two copies to" the College. Significantly, despite its burden under *Hunzinger Construction*, the College does not tie that obligation to any of McNichols's thefts or show how fulfillment of that obligation would have prevented those thefts. Further, there is nothing in the agreement that required Frontier Adjusters, Inc., to audit or monitor

Frontier Adjusters of Milwaukee's relationship with the College. *See Kernz*, 2003 WI App 140, ¶ 9, 266 Wis. 2d at 134, 667 N.W.2d at 755 (we apply contracts according to their terms). Simply put, one cannot breach a contract clause that does not exist.

¶ 25. Based on our *de novo* review, we affirm the circuit court's dismissal of the College's claims against Frontier Adjusters, Inc.

*By the Court.*—Orders affirmed.