ESTATE OF Brianna KRIEFALL, deceased, by her
Special Administrator, Douglas A. Kriefall,
Connie J. Kriefall and Chad Kriefall, a minor,
by his Guardian ad Litem, Plaintiffs,

v.

SIZZLER USA FRANCHISE, INC.,
Defendant-Respondent-Cross-Appellant,†

E & B MANAGEMENT CO., WAUKESHA, d/b/a Sizzler,
Sizzler USA and Secura Insurance, Defendants,†

EXCEL CORPORATION and
American Home Assurance Co.,
Defendants-Appellants-Cross-Respondents.†

[Case No. 2009AP1212.]

ESTATE OF Brianna KRIEFALL, deceased,
by her Special Administrator, Douglas A. Kriefall,
Connie J. Kriefall and Chad Kriefall, a minor,
by his Guardian ad Litem, Plaintiffs,

v.

SIZZLER USA, Defendant,

SIZZLER USA FRANCHISE, INC.,
Defendant-Respondent,†

E & B MANAGEMENT CO., WAUKESHA,
d/b/a Sizzler and Secura Insurance,
Defendants-Respondents-Cross-Appellants,†

†Petition for Review granted 9/27/11.

151

EXCEL CORPORATION and
American Home Assurance Co.,
Defendants-Appellants-Cross-Respondents.†

[Case No. 2010AP491.]

Court of Appeals

*Nos. 2009AP1212, 2010AP491. Oral argument May 24, 2011.
—Decided June 7, 2011.*

2011 WI App 101

(Also reported in 801 N.W.2d 781.)

154

156

159

On behalf of the defendants-appellants-cross-respondents Excel Corporation and American Home Insurance Company, the cause was submitted on the briefs of *Nora Gierke* and *Rebecca Frihart Kennedy* of *Reinhart Boerner Van Deuren S.C.*, Milwaukee, *Barbara I. Michaelides (pro hac vice)*, *Paula M. Carstensen* (pro hac vice) and *Agelo L. Reppas* (pro hac vice) of *Bates Carey Nicolaides LLP*, Chicago, Illinois, *William C. Buhay*, *Earl W. Gunn* and *David I. Matthews* (pro hac vice) of *Weinberg, Wheeler, Hudgins, Gunn & Dial, LLC*, Atlanta, Georgia. There was oral argument by *Paula M. Carstensen*.

On behalf of the defendant-respondent-cross-appellant Sizzler USA Franchise, Inc., the cause was submitted on the brief of *Russell A. Klingaman* and *Noah D. Fiedler* of *Hinshaw & Culbertson LLP*, Milwaukee. There was oral argument by *Frederic Gordon* (pro hac vice) of *Gordon & Holmes*, San Diego, California.

On behalf of the defendants-respondents-cross-appellants E & B Management Co., Waukesha, Inc. and Secura Insurance, a Mutual Company, the cause was submitted on the brief of *Ronald G. Pezze, Jr.* and *Ahndrea R. Van Den Elzen* of *Peterson, Johnson & Murray, S.C.*, Milwaukee. There was oral argument by *Terry Johnson*.

Before Fine, Brennan and Reilly, JJ.

¶ 1. FINE, J. This matter was here before. *Estate of Kriefall ex rel. Kriefall v. Sizzler USA Franchise, Inc.*, 2003 WI App 119, ¶ 1, 265 Wis. 2d 476, 483, 665 N.W.2d 417, 421, held that claims by the estate of a child alleged to have died as the result of, and persons alleged to be injured by, contaminated meat sold by Excel Corporation were not barred by federal preemption. The claims of the Kriefalls and the others alleged to be injured by the meat were settled. This appeal concerns disputes between the Sizzler parties and Excel.

¶ 2. The parties to this appeal are:

- Excel and its insurer, American Home Assurance Company;

- E&B Management Company, Waukesha, d/b/a Sizzler, the owner of the two Sizzler restaurants where the customers ate food contaminated by *E. coli* O157:H7 bacterium alleged to have been on Excel meat delivered to the E&B Sizzler restaurants, and E&B's insurer, Secura Insurance; and

163

- Sizzler USA Franchise, Inc., the company that franchised the E&B Sizzler restaurants. Sizzler USA Franchise is mostly referred to by the parties as simply "Sizzler." For clarity, however, we refer to it as Sizzler USA Franchise to distinguish it from its parent company, Sizzler International, Inc., which is not a party to this appeal.

¶ 3. The jury found the following:

1. Excel breached "an implied warranty of merchantability or implied warranty for the sale of food";

2. Excel's breach was "a cause of damage" to Sizzler USA Franchise;

3. As a result of the breach, Sizzler USA Franchise was entitled to $6,500,000 for "[l]ost profits attributable to company-owned stores," $350,000 for "[l]ost franchise royalties," and $311,000 for "[o]ut of pocket expenses";

4. Excel was "negligent in selling meat adulterated with E. coli 0157:H7";

5. Excel's negligence in selling adulterated meat was "a cause of injuries to the patrons of" the two E&B Sizzler restaurants;

6. E&B was negligent "[a]t the time of the E. coli 0157:H7 outbreak";

7. E&B's negligence was "a cause of injuries to the patrons of" the two E&B Sizzler restaurants;

8. Sizzler USA Franchise was not negligent "as a franchisor";

9. Apportioning causal negligence, Excel was 80% causally negligent, and E&B was 20% causally negligent;

164

10. "Fair[] and reasonabl[e] compensa[tion]" for the following was: "Pain and suffering of Brianna Kriefall after she became ill but before her death" —$1,000,000; "Pain and suffering of *Chad* Kriefall due to E. coli 0157:H7 illness"—$10,000; and "Loss of the Kriefall family's society and companionship with Brianna Kriefall after she became ill but before her death"—$50,000. (Underlining in original.)

¶ 4. Excel and American Home Assurance appeal the trial court's judgments and some orders. E&B and Secura cross-appeal a judgment and some orders. Sizzler USA Franchise cross-appeals two orders. We affirm the judgments and orders except: (1) We reverse the trial court's order permitting E&B and Secura to recover from Excel the money Federal Insurance Company, Sizzler USA Franchise's insurer, paid to Secura; and (2) We reverse the trial court's order rejecting Sizzler USA Franchise's equitable-indemnity claim against Excel. Part I discusses Excel's appeal; Part II discusses E&B's cross-appeal; and Part III discusses Sizzler USA Franchise's cross-appeal.

¶ 5. The appeal and cross-appeals require that we interpret and apply statutes and contracts. In doing so, our review of what the trial court did is *de novo. See Edwards v. Petrone,* 160 Wis. 2d 255, 258, 465 N.W.2d 847, 848 (Ct. App. 1990) (contract); *Village of Shorewood v. Steinberg,* 174 Wis. 2d 191, 201, 496 N.W.2d 57, 61 (1993) (statute). Further, we apply a statute as it is written unless it is constitutionally infirm or its text does not reveal the legislature's intent. *See State ex rel. Kalal v. Circuit Court for Dane County,* 2004 WI 58, ¶¶ 43–44, 271 Wis. 2d 633, 661–662, 681 N.W.2d 110, 123–124. Moreover, ambiguous provisions must be both inter-

preted and applied so they are consistent with the statute read as a whole. *Id.*, 2004 WI 58, ¶ 46, 271 Wis. 2d at 663, 681 N.W.2d at 124. The appeal and cross-appeals also require that we assess the trial court's rulings on evidence and its decisions on scheduling. Our review of those matters is limited to whether the trial court erroneously exercised its discretion. *State v. Sullivan*, 216 Wis. 2d 768, 780, 576 N.W.2d 30, 36 (1998) (Receipt of evidence is vested in the trial court's reasoned discretion.); *Hefty v. Strickhouser*, 2008 WI 96, ¶ 31, 312 Wis. 2d 530, 546–547, 752 N.W.2d 820, 828 (Trial courts have both inherent and statutory discretion to control their dockets.); *Teff v. Unity Health Plans Ins. Corp.*, 2003 WI App 115, ¶ 29, 265 Wis. 2d 703, 724, 666 N.W.2d 38, 49 ("trial court has broad discretion in deciding how to respond to untimely motions to amend scheduling orders"). We will sustain a discretionary determination if "the circuit court examined the relevant facts; applied a proper standard of law; and using a demonstrative rational process, reached a conclusion that a reasonable judge could reach." *Sullivan*, 216 Wis. 2d at 780–781, 576 N.W.2d at 36. Additionally, when more than one analysis supports our decision on the many issues presented by the appeal and cross-appeals, we discuss the dispositive analysis and not others. *See Gross v. Hoffman*, 227 Wis. 296, 300, 277 N.W. 663, 665 (1938) (only dispositive issue need be addressed).

## I.

### (Appeal by Excel and American Home)

A. *Excel's Liability for Consequential Damages.*

¶ 6. Excel contends that the trial court erred in not dismissing Sizzler USA Franchise's implied-warranty consequential-damages claims.

¶ 7. Sizzler USA Franchise cross-claimed against Excel seeking, among other things, damages it contended resulted from Excel's breach of Excel's express warranty that Excel's meat would be wholesome and safe. Sizzler USA Franchise also alleged that Excel breached its implied warranties that Excel's meat was merchantable, was fit to be used in the Sizzler restaurants, and was "safe and fit for human consumption." Sizzler USA Franchise's cross-claim against Excel sought, among other things, "direct, consequential, and incidental damages" suffered by Sizzler USA Franchise as a result of Excel's alleged breach of the warranties.

¶ 8. The express-warranty claim was based on a 1997 document titled "Continuing Guaranty" (uppercasing omitted). The guaranty was between Excel as "Seller" and Sizzler International, Inc., which, as already noted, is the parent company of Sizzler USA Franchise. The guaranty, dated September 22, 1997, provided, as material:

> The undersigned, Excel Corporation (Seller), hereby states that each and every article contained in and comprising each shipment or other delivery hereafter made by Seller, to or on the order of Sizzler International, Inc. (Buyer), is hereby guaranteed, as of the date of each such shipment or delivery, to be: 1. Not adulterated or misbranded within the meaning of the Federal Food, Drug and Cosmetic Act, as amended (if applicable) . . . . This Guaranty shall not render Seller liable for any incidental or consequential damages of whatsoever nature nor shall it extend to the benefit of persons or corporations other than Sizzler International, Inc. or its affiliates.

(Bolding omitted, paragraphing altered.) The trial court held on summary judgment that Excel's liability for consequential damages was specifically excluded from

this Continuing Guaranty by the last sentence, and dismissed Sizzler USA Franchise's express-warranty claim. It also held, however, that this clause did not affect either Excel's duties under the implied-warranty provisions of Wisconsin's Uniform Commercial Code, or Sizzler USA Franchise's remedies under the Code. We look at these provisions before we assess Excel's contentions that the trial court erred in not dismissing Sizzler USA Franchise's implied-warranty consequential-damages claims.

¶ 9. WISCONSIN STAT. § 402.314 provides as material:

(1) Unless excluded or modified (s. 402.316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. Under this section the serving for value of food or drink to be consumed either on the premises or elsewhere is a sale.

(2) Goods to be merchantable must be at least such as:

. . . .

(c) Are fit for the ordinary purposes for which such goods are used.[1]

---

[1] WISCONSIN STAT § 402.316 reads:

(1) Words or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed wherever reasonable as consistent with each other; but subject to s. 402.202 on parol or extrinsic evidence, negation or limitation is inoperative to the extent that such construction is unreasonable.

(2) Subject to sub. (3), to exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing must

WISCONSIN STAT. § 402.315 provides:

> Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under s. 402.316 an implied warranty that the goods shall be fit for such purpose.

be conspicuous, and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous. Language to exclude all implied warranties of fitness is sufficient if it states, for example, that "There are no warranties which extend beyond the description on the face hereof."

(3) Notwithstanding sub. (2), all of the following apply:

(a) Unless the circumstances indicate otherwise, all implied warranties are excluded by expressions like "as is", "with all faults" or other language which in common understanding calls the buyer's attention to the exclusion of warranties and makes plain that there is no implied warranty.

(b) When the buyer before entering into the contract has examined the goods or the sample or model as fully as the buyer desired or has refused to examine the goods there is no implied warranty with regard to defects which an examination ought in the circumstances to have revealed to the buyer.

(c) Except as provided in s. 95.195, there is no implied warranty that cattle, hogs, sheep or horses are free from sickness or disease at the time a sale is consummated if all state and federal regulations pertaining to animal health are complied with by the seller, unless the seller knows at the time a sale is consummated that the cattle, hogs, sheep or horses were sick or diseased.

(d) An implied warranty can be excluded or modified by course of dealing or course of performance or usage of trade.

(4) Remedies for breach of warranty can be limited in accordance with ss. 402.718 and 402.719 on liquidation or limitation of damages and on contractual modification of remedy.

169

¶ 10. The Excel meat that made it into the E&B Sizzler restaurants and gave rise to these actions was sold by a document sent to "Sizzler Franchise Distributors" by Sizzler USA Franchise in February of 2000. The document, titled "Boxed Beef Sales Confirmation and Contract" (uppercasing omitted), identified the "Buyer" as "Sizzler USA, Inc. c/o Franchisees and Distributors." In "Addendum 'A' " to the contract, the various distributors and franchise owners on whose behalf the contract with Excel was negotiated, indicated that "[b]y signing where indicated below [a series of signature pages attached to the contract], the distributor and franchisee owner are responsible for carrying out the terms and conditions of [the contract]." Sysco Corporation, a food distributor for the E&B Sizzler restaurants, signed as "Sysco—Baraboo, W[i]s."; a handwritten note on that signature page reads "Sysco/Eastern Wisconsin." The Addendum also recited that the contract was "entered into between Excel Corporation and Sizzler Int'l" on the date shown. Again, Sizzler International is the parent company of Sizzler USA Franchise.

¶ 11. As noted, the trial court ruled that Sizzler USA Franchise was entitled to recover its consequential damages suffered as a result of Excel's alleged breach of its implied warranties under the Uniform Commercial Code. The jury awarded significant damages. Excel gives four reasons, which we analyze in turn, why it believes that the trial court was wrong.

1. *Exclusion of consequential damages in the "Continuing Guaranty," Excel's express-warranty undertaking.*

¶ 12. Excel claims that a clause in the Continuing Guaranty ("This Guaranty shall not render Seller liable

170

for any incidental or consequential damages of whatsoever nature nor shall it extend to the benefit of persons or corporations other than Sizzler International, Inc., or its affiliates") removed consequential damages from the implied warranties as well. We disagree.

¶ 13. " 'In construing the terms of a contract, where the terms are plain and unambiguous, it is the duty of the court to construe it as it stands, even though the parties may have placed a different construction on it.' " *Algrem v. Nowlan*, 37 Wis. 2d 70, 79, 154 N.W.2d 217, 221 (1967) (citation omitted). *See also Eddy v. B.S.T.V., Inc.*, 2005 WI App 78, ¶ 2, 280 Wis. 2d 508, 511, 696 N.W.2d 265, 267. This means that "[w]hen the language is unambiguous, we apply its literal meaning." *Farm Credit Services of North Cent. Wisconsin, ACA v. Wysocki*, 2001 WI 51, ¶ 12, 243 Wis. 2d 305, 314, 627 N.W.2d 444, 448. As the trial court recognized, the phrase in the Continuing Guaranty excluding the right of Sizzler USA Franchise to recover consequential damages is hardly ambiguous and encompasses only the express warranties undertaken by the Continuing Guaranty: "*This Guaranty* shall not render Seller liable for any incidental or consequential damages of whatsoever nature." (Emphasis added.) Stated another way, incidental and consequential damages are excluded from those damages that might be recovered *if* the express warranties in the Continuing Guaranty were breached. Excel argues that the Continuing Guaranty's consequential-damages exclusion should apply to the implied warranties under the Uniform Commercial Code because, as Excel writes in its main appellate brief, the exclusion represents the parties' "bargained for allocation of risk." (Capitalization omitted.) The parties specifically limited their "allocation of risk" in

connection with consequential damages, however, to the express warranties agreed-to in the Continuing Guaranty. We may not re-write a contract to do what one of the parties now wishes in retrospect it had done before. *See Hortman v. Otis Erecting Co., Inc.*, 108 Wis. 2d 456, 461, 322 N.W.2d 482, 484–485 (Ct. App. 1982).

¶ 14. Further, the incidental-and-consequential-damages clause does not purport to encompass implied warranties created elsewhere—here the Uniform Commercial Code. As we explain in the next subsection, nothing in the Uniform Commercial Code incorporates into the Code's implied-warranty provisions the Continuing Guaranty's express-warranty incidental-and-consequential-damages exclusion.

2. *Implied Warranties Under the Uniform Commercial Code.*

¶ 15. As we have seen, Excel's delivery of contaminated meat to the E&B Sizzler restaurants breached implied warranties recognized by WIS. STAT. §§ 402.314 and 402.315. In support of its contention that the trial court erred in not dismissing Sizzler USA Franchise's claim for implied-warranty consequential damages, Excel points to WIS. STAT. § 402.719(3), which permits a contract to limit or exclude consequential damages. Section 402.719 reads in full:

(1) Subject to subs. (2) and (3) and to s. 402.718 on liquidation and limitation of damages:

(a) The agreement may provide for remedies in addition to or in substitution for those provided in this chapter and may limit or alter the measure of damages recoverable under this chapter, as by limiting the buyer's remedies to return of the goods and repayment of the price or to repair and replacement of nonconforming goods or parts; and

172

(b) Resort to a remedy as provided is optional unless the remedy is expressly agreed to be exclusive, in which case it is the sole remedy.

(2) Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in chs. 401 to 411.

(3) Consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable. Limitation of consequential damages for injury to the person in the case of consumer goods is prima facie unconscionable but limitation of damages where the loss is commercial is not.[2]

---

[2] WISCONSIN STAT. § 402.718 reads:

(1) Damages for breach by either party may be liquidated in the agreement but only at an amount which is reasonable in the light of the anticipated or actual harm caused by the breach, the difficulties of proof of loss, and the inconvenience or nonfeasibility of otherwise obtaining an adequate remedy. A term fixing unreasonably large liquidated damages is void as a penalty.

(2) Where the seller justifiably withholds delivery of goods because of the buyer's breach, the buyer is entitled to restitution of any amount by which the sum of the buyer's payments exceeds:

(a) The amount to which the seller is entitled by virtue of terms liquidating the seller's damages in accordance with sub. (1); or

(b) In the absence of such terms, 20 percent of the value of the total performance for which the buyer is obligated under the contract or $500, whichever is smaller.

(3) The buyer's right to restitution under sub. (2) is subject to offset to the extent that the seller establishes:

(a) A right to recover damages under this chapter other than sub. (1); and

(b) The amount or value of any benefits received by the buyer directly or indirectly by reason of the contract.

¶ 16. As we noted in subpart 1, the incidental-and-consequential-damages limitation in the Continuing Guaranty applies only to any breach of express warranties *created* by that agreement ("This guaranty shall not render Seller liable for any incidental or consequential damages") and thus the limitation did not extend beyond the four corners of the Continuing Guaranty. Equally significant, WIS. STAT. § 402.719 applies *by its terms* to contracts for sale that create or modify "remedies" authorized by the Code ("The agreement [between the parties] may provide for remedies in addition to or in substitution for those provided in this chapter and may limit or alter the measure of damages recoverable under this chapter."), and subsection (3) addresses the limitation or exclusion of consequential damages in such an "agreement." Excel has pointed to none of the pertinent contracts of sale that even addresses consequential damages resulting from a *breach of the Uniform Commercial Code's implied warranties* in WIS. STAT. §§ 402.314 and 402.315.

¶ 17. Significantly, Excel could have under WIS. STAT. § 402.316 both: (i) sought "to exclude or modify the implied warranty of merchantability" as well as "any implied warranty of fitness," *see* § 402.316(2) & (3); and (ii) limited or modified remedies for their breach, *see* § 402.316(4) ("Remedies for breach of warranty can be limited in accordance with ss. 402.718 and 402.719 on liquidation or limitation of damages and on contractual

---

(4) Where a seller has received payment in goods their reasonable value or the proceeds of their resale shall be treated as payments for the purpose of sub. (2); but if the seller has notice of the buyer's breach before reselling goods received in part performance, the seller's resale is subject to the conditions laid down in s. 402.706 on resale by an aggrieved seller.

174

modification of remedy."). *See Murray v. Holiday Rambler, Inc.*, 83 Wis. 2d 406, 414–419, 265 N.W.2d 513, 517–520 (1978) (discussing §§ 402.316 and 402.719). Excel put nothing into any of the contracts of sale (other than, as already noted at length, the Continuing Guaranty, which, as we have explained, does not modify the implied warranties recognized by the Uniform Commercial Code) that even purports to disclaim, modify or limit either the implied warranties or the remedies for their breach. This is what distinguishes what we have here from *Wyatt Industries, Inc. v. Publicker Industries, Inc.*, 420 F.2d 454 (5th Cir. 1969), on which Excel relies.

¶ 18. In *Wyatt Industries*, Publicker hired Wyatt to build a pressure vessel that Publicker was going to use in order to process synthetic ethanol. *Id.*, 420 F.2d at 455. Wyatt warranted "the completed work against defective material and workmanship, exclusive of corrosion or erosion, for the period of one year from completion thereof." *Id.*, 420 F.2d at 456. The guarantee also provided that Wyatt's "liability under this warranty shall be limited to the replacement within the aforesaid time of any defective work or material f.o.b. Fabricator's shop, and Fabricator shall be liable for no other damages or losses." *Ibid.* If that were all to Wyatt's undertaking, the limitation would have been effective. But, as the building and testing of the pressure vessel showed cracks and leaks, Publicker agreed to accept delivery only if the guarantee was modified. *Ibid.* It was modified: "an agreement was reached whereby the cracks would be repaired and the vessel would be shipped 'as is' on the condition that Wyatt would be absolved of liability for damage claims or repair costs in excess of $25,000." *Ibid.* The phrase "as is" is, of course, one of the ways the Uniform Commercial Code recognizes that warranties may be excluded or modified. *See* Wis. Stat.

175

§ 402.316(3)(a). The pressure vessel was apparently still flawed, and when Wyatt sued to recover its purchase price, Publicker counterclaimed "for loss of profits due to business interruptions occasioned by defects" in the pressure vessel, and also expenses it claimed for replacing and making serviceable a new pressure vessel. *Wyatt Industries*, 420 F.2d at 456. *Wyatt Industries* held that the express "as is" agreement, which modified the original guaranty, was effective under §§ 2–316 and 2–719 Uniform Commercial Code (substantially identical to WIS. STAT. §§ 402.316 and 402.719). There was no similar modification by Excel of the Code's implied warranties so as to limit the remedy for their breach.[3]

> 3. *May Sizzler USA Franchise Sue for Breach of Implied Warranties under the Uniform Commercial Code?*

¶ 19. Excel argues that Sizzler USA Franchise, although listed as "Buyer" in the "Boxed Beef Sales Confirmation and Contract" (uppercasing omitted), was not the buyer of the meat under the Uniform Commercial Code because it "never took possession of Excel's

---

[3] For an example of a clause that modified remedies for the breach of a warranty, *see Trinkle v. Schumacher Co.*, 100 Wis. 2d 13, 14, 17–20, 301 N.W.2d 255, 256, 258–259 (Ct. App. 1980), which held, under the circumstances in that case, that the limitation was "unconscionable"—*see* WIS. STAT. § 402.719(3).

As a matter of historical interest, the author of *Wyatt Industries, Inc. v. Publicker Industries, Inc.*, 420 F.2d 454 (5th Cir. 1969), was G. Harold Carswell, whom Richard M. Nixon unsuccessfully nominated for a seat on the United States Supreme Court. One of the other members of the *Wyatt Industries* panel was Homer Thornberry, whom Lyndon Baines Johnson unsuccessfully nominated for a seat on the United States Supreme Court.

beef and never paid Excel for the beef."[4] Thus, Excel contends, Sizzler USA Franchise cannot sue for breach of the Code's implied warranties. We disagree.

¶ 20. Whether Sizzler USA Franchise is a "buyer" under WIS. STAT. ch. 402, which "applies to transactions in goods," WIS. STAT. § 402.102, "is easily decided from the language of the statute," *see Hemberger v. Bitzer*, 216 Wis. 2d 509, 516, 574 N.W.2d 656, 659 (1998) (statutory interpretation in general), to which we now turn. WISCONSIN STAT. § 402.103(1)(a) defines " 'Buyer' " as "a person who buys or *contracts to buy goods*" "unless the context otherwise requires." (Emphasis added.) Thus, so far, Sizzler USA Franchise qualifies as a "buyer" because it contracted to buy the Excel meat, and it was entitled to delegate to the distributors and franchisees acceptance of the contracted-for-meat. *See* WIS. STAT. § 402.210(1) ("A party may perform that party's duty through a delegate unless otherwise agreed or unless the other party has a substantial interest in having his or her original promisor perform or control the acts required by the contract.") Although WIS. STAT. § 402.106(6) tells us that "[a] 'sale' consists in the passing of title from the seller to the buyer for a price (s. 402.401)," the passing of title is not always required because § 402.106's introductory phrase notes that the definitions in § 402.106 apply "unless the context otherwise requires."[5] Moreover, WIS. STAT. § 402.401, which

---

[4] As noted earlier, the contract has "Sizzler USA Inc. c/o Franchisees and Distributors" as the "Buyer." None of the parties dispute that this is the entity named in the Record as Sizzler USA Franchise.

[5] WISCONSIN STAT. § 402.106(6) thus reads: "In this chapter unless the context otherwise requires: . . . (6) A 'sale' consists in the passing of title from the seller to the buyer for a price (s. 402.401)."

is specifically referenced in § 402.106(6), tells us: "Each provision of this chapter with regard to the *rights, obligations, and remedies of the seller, the buyer,* purchasers, or other 3rd parties *applies irrespective of title to the goods* except where the provision refers to such title." (Emphasis added.) Since a "buyer" can be, as we have seen, "a person who . . . contracts to buy goods," Sizzler USA Franchise qualifies and passing of title to it is not a prerequisite to its recovery of damages flowing from Excel's breach of its implied warranties.

¶ 21. Equally significant, Wis. Stat. ch. 402 does not just apply to a "sale," as that term is defined by Wis. Stat. § 402.106(6), but to the more general aspect of commerce: "transactions in goods." Wis. Stat. § 402.102. Thus, the law generally recognizes that Article 2 of the Uniform Commercial Code is not limited to "sales" *per se. See Mieske v. Bartell Drug Co.,* 593 P.2d 1308, 1312 (Wash. 1979). *Mieske* explains: " 'It is now clearly established that the reach of Article 2 [adopted in Wisconsin as ch. 402,] goes considerably beyond the confines of that type transaction which the Code itself defines to be a "sale"; namely, the passing of title from a party called the seller to one denominated a buyer for a price.' " *Mieske,* 593 P.2d at 1312 (quoting treatise) (bailment within Article 2). This is consistent with the provision in Wis. Stat. § 402.401 that passing of "title" is not always required.

¶ 22. Finally, nothing in Wis. Stat. §§ 402.314 or 402.315, restricts *in haec verba* the implied-warranties in those sections to "buyers." Rather, § 402.314 tells us that the implied warranty of merchantability applies "in a contract for [the "sale" of "goods"] if the seller is a merchant with respect to goods of that kind." Excel does not dispute that it is the "seller" in connection with the Boxed Beef Sales Confirmation and Contract for the

meat packages destined for the Sizzler franchisees, and that the document was, as § 402.314 requires, "a contract for their sale." Similarly, § 402.315 tells us that the implied warranty of fitness applies: "[w]here the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods." Since as we have already seen, under Wis. Stat. § 402.103(1)(a) a "Buyer" can be "a person who . . . contracts to buy goods," and Excel as the "seller" had "reason to know" both (i) what would be done with the meat it sold and (ii) that Sizzler USA Franchise (the entity "contract[ing ]to buy") was "relying on [Excel]'s skill or judgment to select or furnish suitable goods," the implied warranty recognized by § 402.315 applies to the meat making it into the E&B Sizzler restaurants even though Sizzler USA Franchise did not, itself, take delivery (which, as we have seen, it was permitted to do under Wis. Stat. § 402.210(1)).

## 4. *Privity of Contract.*

■■■

¶ 23. Excels argues that Sizzler USA Franchise's "warranty claims also fail because Excel and Sizzler [USA Franchise] are not in privity of contract." This is a puzzling assertion because, as we have seen at some length, the "Boxed Beef Sales Confirmation and Contract" (uppercasing omitted) was between Excel and Sizzler USA Franchise. The nub of Excel's contention, though, is that Sizzler USA Franchise did not itself take delivery of the meat under the contract.[6] But, as we have already discussed in detail, Sizzler USA Franchise need

---

[6] This is how Excel puts it in its main brief on this appeal: "Through the Boxed Beef Contract, Excel sold beef not

not have received either the meat or title to the meat; it is sufficient under the Code that it "contract[ed] to buy" the meat. *See* WIS. STAT. § 402.103(1)(a) (defining "[b]uyer"). Further, there is evidence in the Record that although the Boxed Beef contract required the Sizzler franchisees to pay their distributors for the Excel meat, Sizzler International, Sizzler USA Franchise's parent, remained on the hook to Excel if a franchisee or distributor did not pay Excel. Moreover, as we have seen, WIS. STAT. § 402.210(1) recognizes, with an exception not relevant, that "[a] party may perform that party's duty through a delegate unless otherwise agreed." This is the resulting syllogism:

- It was in Sizzler USA Franchise's interest for its franchisees to get meat because a franchiser in the business of having franchisees who sell meat products must ensure that the franchisees have a ready source of meat at a competitive price.

- Sizzler USA Franchise therefore negotiated with Excel for delivery of meat that, under the Uniform Commercial Code, was subject to implied warranties of merchantability and fitness.

- The very nature of the franchise business is that the franchisor generally delegates to its franchisees the receipt, use, and payment for materials used by the franchisees, even though the franchisor will generally negotiate for purchase of the products used by the franchisees in order to get the benefits of economy-of-scale purchasing.

Excel's sale of meat under its contract with Sizzler USA Franchise as franchisor was obviously designed to benefit both Sizzler USA Franchise and its franchisees

---

to Sizzler [USA Franchise], but to one of [Sizzler USA Franchise]'s approved distributors, such as Sysco."

because a franchise operation that sells meat products needs a supply of meat. Indeed, Excel noted during oral argument that it is "standard" for franchisors to contract for the sale of product to its franchisees. Excel cannot avoid the consequences of its breach of the implied warranties by fogging the issue with strained analysis. *See U.S. Bank Nat'l Ass'n v. City of Milwaukee*, 2003 WI App 220, ¶ 8, 267 Wis. 2d 718, 730, 672 N.W.2d 492, 497. Thus, analogously, in *Los Angeles Paper Bag Co. v. James Talcott, Inc.*, 604 F.2d 38 (9th Cir. 1979), a food store ordered bags from its distributor, which placed the order with the manufacturer. *Id.*, 604 F.2d at 39. The manufacturer shipped the bags to the food store directly. *Ibid.* The distributor's check bounced. *Ibid. Los Angeles Paper Bag* held that a financing company's security interest in the distributor's "inventory, after-acquired property, and accounts receivable" was superior to the manufacturer's claim for the bounced check *even though* the bags "never became inventory in the physical possession of" the distributor. *Id.*, 604 F.2d at 39–40:

> In substance, if not in form, the transaction at issue here is just the same as if the paper goods had been warehoused temporarily by [the distributor] and then delivered to [the food store]. Delivery of goods to a third party pursuant to a buyer's instructions is sufficient delivery to pass whatever rights and title the buyer might have had in the goods to the third party, just as if the delivery had been made by the buyer himself.

*Id.*, 604 F.2d at 40. Excel's contention that Sizzler USA Franchise cannot recover for breach of the Code's implied warranties for damages it sustained as a result of Sizzler USA Franchise's contract with Excel is without merit. The trial court did not err.

181

B. *Excel's Obligation to Indemnify E&B and Secura for their Payments under Pierringer Releases to the non-Kriefall claimants.*

¶ 24. E&B and Sizzler USA Franchise and their insurers settled with the non-Kriefall claimants under releases authorized by *Pierringer v. Hoger,* 21 Wis. 2d 182, 124 N.W.2d 106 (1963). *See id.,* 21 Wis. 2d at 184–185, 191–192, 124 N.W.2d at 108, 111–112 (A *Pierringer* release bars contribution actions that the non-settling defendants might have against the settling defendants.); *see also VanCleve v. City of Marinette,* 2003 WI 2, ¶ 39, 258 Wis. 2d 80, 100, 655 N.W.2d 113, 123 ("[A] *Pierringer* release operates to impute to the settling plaintiff whatever liability in contribution the settling defendant may have to non-settling defendants and to bar subsequent contribution actions the non-settling defendants might assert against the settling defendants."). A *Pierringer* release thus satisfies "that portion of the plaintiff's cause of action for which the settling joint tortfeasor is responsible, while at the same time reserving the balance of the plaintiff's cause of action against a nonsettling joint tortfeasor." *Imark Industries, Inc. v. Arthur Young & Co.,* 148 Wis. 2d 605, 621, 436 N.W.2d 311, 318 (1989).[7]

---

[7] On page 36 of its brief responding to Excel's main appellate brief, E&B asserts: "[n]ot a single non-Kriefall [*Pierringer*] settlement agreement" is in the Record. That is not true, as Excel's reply brief points out. One of the many *Pierringer* releases executed by the non-Kriefall claimants is in the Record and was put there by E&B's trial lawyer. We caution appellate counsel for E&B that justice can only be done under accepted legal principles if all parties to a dispute take care not to exaggerate or mislead. *See Wisconsin Natural Gas Co. v. Gabe's Constr. Co., Inc.,* 220 Wis. 2d 14, 19 n.3, 582 N.W.2d 118, 119 n.3 (Ct. App.1998) ("misleading statements in briefs" violate "SCR

¶ 25. E&B and Secura sought indemnification from, and tendered its defense to, Excel under the 1993 "Hold Harmless Agreement and Guaranty/Warranty of Product" that Excel gave to Sysco. (Uppercasing omitted.) Excel accepted the tender "under a reservation of rights," which, among other things, asserted "that the 1993 Hold Harmless Agreement and Guaranty/Warranty of Product" did not apply. The Hold Harmless Agreement guaranteed, as material, that "articles contained in any shipment or delivery made by" Excel "to or on the order of Sysco" was not "adulterated or misbranded." Under the Hold Harmless Agreement, Excel "agree[d] to defend, indemnify and hold harmless [Sysco] and its . . . customers . . . from all actions, suits, claims and proceedings ("Claims"), and any judgments, damages, fines, costs and expenses (including reasonable attorneys' fees) re-

---

20:3.3, which requires candor toward tribunals."). At the very least, counsel for E&B should have sent a letter to us and all other counsel apologizing for the misstatement, or acknowledged at oral argument the misstatement. They have not.

The *Pierringer* release executed by a non-Kriefall claimant that is in the Record, is headed "Confidential Pierringer Release and Indemnification Agreement" (uppercasing omitted), it is between a non-Kriefall claimant, whose name was redacted, on the one hand, and E&B and Sizzler USA Franchise and their insurers, Secura and Federal Insurance Company, on the other hand. In the Release, the claimant "releases and discharges the Released Parties . . . only from that fraction, percentage, or portion of all liability accrued and hereafter to accrue against the released parties." It also releases "that portion of the total amount of [the claimant's] damages and losses which may have been caused by any acts or omissions of E&B or Sizzler USA [Franchise] as may be determined in any subsequent trial . . . . It is Claimants' act and intention to satisfy any judgment . . . as the ca[us]al negligence or responsibility of E&B, Sizzler USA [Franchise] and the Insurers is adjudged to be of all causal negligence or responsibility."

sulting therefrom." Excel concedes that E&B and Sizzler USA Franchise are "customers" of Sysco in connection with the tainted meat it shipped to the E&B Sizzler restaurants.

¶ 26. The agreement then fleshed out, as material here: (1) the nature of the "Claims" that would trigger Excel's obligations under the Hold Harmless Agreement, and (2) the scope of those obligations. It covered claims:

> (ii) brought or commenced by any person or entity against any [customer] for the recovery of damages for the injury, illness and/or death of any person or damage to property arising out of or alleged to have arisen out of (a) the delivery, sale, resale, labeling, use or consumption of any Product, or (b) the negligent acts or omissions of [Excel]; provided, however, that [Excel]'s indemnification obligations hereunder shall not apply to the extent that Claims are caused by the negligent acts or omissions of [Sysco] or any other third party.

Excel contends that it is not liable under the Hold Harmless Agreement because (1) the jury found that E&B was twenty-percent contributorily negligent, and (2) settlements made in exchange for *Pierringer* releases are not, as they express it in their main brief on this appeal, "recoverable under the 1993 Hold Harmless Agreement." (Some capitalization omitted.) We disagree.

### 1. *E&B's Contributory Negligence.*

¶ 27. The jury found that E&B was twenty-percent contributorily negligent, and Excel was eighty-percent contributorily negligent, in connection with the death and illnesses caused by the *E. coli* pathogen. Under the Hold Harmless Agreement's unambiguous language, however, Excel is only relieved of its indemnity obligations "to the extent" that the harm was

contributed-to by the negligence of "any other third party."[8] Thus, under the Hold Harmless Agreement, Excel has to indemnify E&B for harm attributable to Excel's eighty-percent negligence. Excel contends, however, that the *Pierringer*-release settlements "are, as a matter of law, attributable to E&B and [Sizzler USA Franchise]'s causal negligence," so that Excel's liability to E&B under the Hold Harmless Agreement is zero.[9] We analyze this argument.

2. *The Pierringer releases.*

¶ 28. As we have seen, a *Pierringer* release bars a *non-settling defendant* (here, Excel) from seeking contribution from the *settling defendant* (here, E&B) for damages that a plaintiff might recover that are attributable to the *settling defendant's* causal negligence (here, 20%) because the plaintiff has, by virtue of the *Pierringer* release, agreed to indemnify the settling defendant (E&B) to the extent that the settling defendant (E&B) is found to be causally negligent. Thus, by virtue of the *Pierringer* releases, Excel's financial responsibility for the non-Kriefall claimants' injuries is reduced by the twenty-percent of fault attributed to E&B.

¶ 29. Excel argues, however, that because E&B and Secura bought their peace by settling with the non-Kriefall claimants under a *Pierringer* release, thus extinguishing the percentage of damages that was attributable to E&B, E&B may not get any indemnity

---

[8] E&B does not argue that it is not within the phrase "any other third party."

[9] As we have seen, the jury found that Sizzler USA Franchise was not negligent.

from Excel because of the interplay between the Hold Harmless Agreement and the *Pierringer* release. Excel relies mainly on *Unigard Ins. Co. v. Insurance Co. of North America*, 184 Wis. 2d 78, 516 N.W.2d 762 (Ct. App. 1994).

¶ 30. Unigard settled with a *Pierringer* release its liability and the liability of its insured. *Id.*, 184 Wis. 2d at 83, 516 N.W.2d at 764. The *Pierringer* release specifically reserved Unigard's right to seek contribution from others who could not be made parties in the settled action, and provided that Unigard and its insured were " '*not releasing any rights, claims or causes of action of any nature they may have against any other person or entities.*' " *Ibid.* (emphasis by *Unigard*). Unigard thus contended that "the *Pierringer* release only prevented contribution or indemnification actions against the nonsettling parties *named* in the lawsuit." *Id.*, 184 Wis. 2d at 83–84, 516 N.W.2d at 764 (emphasis by *Unigard*). There was an additional clause in the release, however:

> As a further consideration, the releasing parties agree to indemnify the released parties released herein and to save them harmless *from any claims for contribution made by others so adjudged jointly liable* with the parties being released, and releasing parties agree to satisfy any judgment which may be rendered in their favor, *satisfying such fraction, portion or percentage of the judgment as the causal negligence of all adjudged tortfeasors.*

*Id.*, 184 Wis. 2d at 84, 516 N.W.2d at 764 (emphasis by *Unigard*). *Unigard* held that despite the settling defendants' (Unigard and its insured) attempt to preserve their rights of contribution against the non-party tortfeasors, contribution was barred:

> Equity, logic and common sense convince this court that the body of law interpreting the consequences of a

> *Pierringer* release should not have any different appli-
> cation to a nonparty tort-feasor versus a named party
> tort-feasor. Simply put, because the *Pierringer* release
> protects a settling defendant from contribution or
> indemnification claims of nonparty tort-feasors, the
> settling defendant's own claims for contribution or
> indemnification against nonparty tort-feasors are like-
> wise barred.

*Id.*, 184 Wis. 2d at 87–88, 516 N.W.2d at 766.

¶ 31. Excel invokes *Unigard,* and argues that since "amounts paid in exchange for *Pierringer* releases are payments attributable to that portion of [the non-Kriefall] plaintiffs' claims attributable to E&B," the settlement "payments for which E&B seeks recovery are not even covered under the hold harmless agreement" because the Agreement, as we have seen, specifically removes "Claims [that] are caused by the negligent acts or omissions of . . . any other third party" from Excel's duty to indemnify. In essence, Excel contends that even though the jury determined that it was eighty-percent negligent in connection with the harm caused by the *E. coli* pathogen that made it to the E&B Sizzler restaurants, it is not liable for that eighty-percent in connection with the money E&B and Secura paid to settle with the non-Kriefall claimants. We disagree.

¶ 32. First, if E&B and Secura had not settled with the non-Kriefall claimants, and had the jury awarded damages to the non-Kriefall claimants, and had the jury apportioned the negligence as it did here (20% for E&B, and 80% for Excel), there is no doubt but that E&B and Secura would have a right to be indemnified under the Hold Harmless Agreement for all "damages for the injury, illness and/or death of any person" caused by the pathogen, but only "to the extent" that those damages were not "caused by the negligent

187

acts or omissions of" E&B. This means that Excel would have been liable under the Agreement for eighty-percent of the damages awarded to the non-Kriefall claimants. It would be odd indeed, if E&B's *Pierringer*-release settlement could wipe out all of Excel's liability to E&B under the Hold Harmless Agreement.

¶ 33. Second, the mix of the non-Kriefall claimants' *tort* claims against Excel and E&B, and E&B and Secura's *contract* claims for indemnity under the Hold Harmless Agreement, is a mix of, to use the cliché, apples and oranges. In the traditional *Pierringer*-release situation, the plaintiff has tort claims against a group of defendants, some of whom settle with the plaintiff. Absent a *Pierringer* release, the non-settling defendants would, if they were found liable at trial, have contribution rights against the settling defendants. *See Unigard*, 184 Wis. 2d at 85–86, 516 N.W.2d at 765. The *Pierringer* release wipes that out by, as we have already seen, imputing "to the settling plaintiff whatever liability in contribution the settling defendant may have to non-settling defendants and to bar subsequent contribution actions the non-settling defendants might assert against the settling defendants." *See VanCleve*, 2003 WI 2, ¶ 39, 258 Wis. 2d at 100, 655 N.W.2d at 123.

■■

¶ 34. The situation here is, however, different than the tort triangle where *Pierringer* releases are used (plaintiff settling with some tortfeasors and prevailing at trial against non-settling tortfeasors who, absent a *Pierringer* release, could seek contribution from the settling tortfeasors) because here we have Excel's *contractual* undertaking to indemnify E&B for harm caused by Excel. Thus, as *Eden Stone Co., Inc. v. Oakfield Stone Co., Inc.*, 166 Wis. 2d 105, 120, 479 N.W.2d 557, 563–564 (Ct. App. 1991) recognized:

It is axiomatic that a *Pierringer* release can only function in a setting involving joint tortfeasors. *See Pierringer v. Hoger,* 21 Wis. 2d 182, 124 N.W.2d 106 (1963). We see nothing in the *Pierringer* decision which envisions the use of such releases in any other setting. And the ensuing development of *Pierringer* law has never extended or recognized the use of such releases where one defendant is sued in contract and another in tort.[10]

We agree. Simply put, Excel promised to pay for the breach of its Hold Harmless Agreement "to the extent" it was, compared to the "Buyer and other third parties", responsible; the law holds Excel to that promise. The trial court correctly refused to dismiss *in toto* the indemnity claims of E&B and Sizzler USA Franchise against Excel under the 1993 Hold Harmless Agreement.

---

[10] We recognize that the facts in *Eden Stone Co., Inc. v. Oakfield Stone Co., Inc.,* 166 Wis. 2d 105, 479 N.W.2d 557 (Ct. App. 1991), are not wholly congruent with what we have here. In *Eden Stone,* Eden Stone, a stone quarrier, filed suit for the tort of conversion against a competitor that was encroaching on a quarry to which Eden Stone had exclusive rights. *Id.,* 166 Wis. 2d at 110, 479 N.W.2d at 560. Eden Stone also sued the quarry owner for breach of contract. *Id.,* 166 Wis. 2d at 119, 479 N.W.2d at 563. Eden Stone settled with the quarry owner and got a release that used *Pierringer* language. *Id.,* 166 Wis. 2d at 119–120, 479 N.W.2d at 563. The encroaching competitor argued that Eden Stone thus stood in the shoes of the landowner and because the encroaching competitor contended that the landowner was "more culpable" than it, the fault that should have been imputed to Eden Stone was greater than the encroaching competitor's fault and, therefore, Eden Stone could not recover for the encroaching competitor's conversion. *Id.,* 166 Wis. 2d at 119, 479 N.W.2d at 563. *Eden Stone* declined to mix the species of causes of action (tort and contract) even though Eden Stone's settlement of its contract action against the quarry owner used *Pierringer*-release language.

### 3. Contribution by Federal Insurance to the Pierringer-Release Settlement with the Non-Kriefall Claimants.

¶ 35. Federal Insurance paid $1 million to Secura to help Secura settle with the non-Kriefall claimants. Even though there is no evidence in the Record that Secura either repaid that money, or is obligated to do so, the trial court held that E&B could get that money from Excel by virtue of the Hold Harmless Agreement. We disagree because there is nothing in the Hold Harmless Agreement that justifies that windfall, and because the collateral-source rule, which permits windfalls under certain circumstances, is not applicable.

¶ 36. The collateral-source rule is an equitable doctrine that prevents a tortfeasor from benefiting if a plaintiff gets money from either: (1) an entity obligated to reimburse the plaintiff for damages sustained as the result of something the tortfeasor did (an insurance company, for example, that pays for medical expenses the plaintiff incurred as the result of something the tortfeasor did), or (2) a volunteer that helps the plaintiff with expenses (a charity, for example, that buys food and pays rent for a plaintiff unable to work as the result of something the tortfeasor did), *see Fischer v. Steffen*, 2011 WI 34, ¶¶ 30, 34, 333 Wis. 2d 503, 515, 797 N.W.2d 501, 506 ("In general, the collateral source rule provides that a tortfeasor's liability to an injured person is not reduced because the injured person receives funds from other sources.") (footnote omitted) (collateral-source rule is an equitable doctrine); *Ellsworth v. Schelbrock*, 2000 WI 63, ¶ 14, 235 Wis. 2d 678, 687, 611 N.W.2d 764, 768 ("[T]he collateral source rule is invoked when a third party pays

or gratuitously provides or pays for benefits to the injured party."). E&B, however, is not the type of party that the collateral source rule was designed to benefit— E&B is a *tortfeasor,* not an injured party. As between giving a windfall to either an injured claimant or to the tortfeasor that caused the claimant's injuries, the collateral -source rule gives the windfall to the injured claimant. *See Voge v. Anderson,* 181 Wis. 2d 726, 732–733, 512 N.W.2d 749, 751–752 (1994). Federal Insurance is not seeking from Excel the money it paid to Secura. Federal Insurance is also not seeking to get that money from Secura. To allow E&B to collect from Excel the money Federal Insurance paid to Secura would thus give E&B a windfall, and there is nothing in logic or in the law to which E&B and Secura have pointed or that we have found that permits such a bizarre result.[11] Accordingly, we reverse the trial court's order permitting E&B to recover from Excel the money Federal Insurance paid to Secura.

C. *Evidentiary Issues.*

¶ 37. Excel contends that the trial court erroneously exercised its discretion in connection with several evidentiary issues. We analyze these matters in turn.

1. *Testimony of Michael Schwochert.*

¶ 38. Schwochert was an employee of the United States Department of Agriculture assigned to Excel's meat-processing plant that is implicated in this case. He was, according to his testimony, a "supervisory veterinarian medical officer" and described for the jury the plant's

---

[11] The Record does not tell us why Federal Insurance did not seek to get the $1 million back from Secura.

meat processing and whether, during the time he was an inspector at the plant, which ended shortly before the plant processed the meat that was delivered to the E&B's Sizzler restaurants, to what extent the plant complied with its Hazard Analysis And Critical Control Point System. *See Kriefall*, 2003 WI App 119, ¶ 19, 265 Wis. 2d at 497–498, 665 N.W.2d at 428 (discussing the federal requirement that meat-processing plants devise and follow Hazard Analysis and Critical Control Point Systems). Although Sizzler USA Franchise identified Schwochert as a trial witness, it did not designate him as an expert witness to give opinions within the scope of then-extant Wis. Stat. Rule 907.02.[12] Excel did not depose Schwochert.

¶ 39. Excel contends that the trial court improperly permitted Schwochert to testify as an expert, in violation of the trial court's scheduling order, which required that persons to be called to give expert testimony be identified as such. Specifically, Excel points to Schwochert's opinion that, as phrased by its main brief on this appeal, "it would take 'someone being killed' before the meat processing industry would implement procedures whereby it could produce a non-defective product." (Quoting Schwochert's testimony.) Excel points to nothing else in Schwochert's testimony that it claims was an opinion within the scope of Wis. Stat. Rule 907.02.

¶ 40. Assuming with some skepticism but not deciding one way or another that the quoted testimony

---

[12] Wisconsin Stat. Rule 907.02 was amended by 2011 Wis. Act 2, and the new rule "first appl[ies] to actions or special proceedings that are commenced on" February 1, 2011. *See* 2011 Wis. Act 2, § 45(5).

was an "expert" opinion, the problem with Excel's appellate argument is that it does not point to any place during the trial (or before, via a motion *in limine*) where it contemporaneously objected to that opinion or to any question on the ground that the question called for Schwochert's "expert" opinion. A witness's ability to testify about a matter, whether a non-expert observation or an expert opinion, is decided question-by-question. *See Brown County v. Shannon R.*, 2005 WI 160, ¶ 36, 286 Wis. 2d 278, 300, 706 N.W.2d 269, 281 ("An expert witness is qualified if 'he or she has superior knowledge in the area in which the precise question lies.' An expert witness, though qualified to testify, may not be qualified to testify with regard to a particular question.") (quoted sources and footnotes omitted); WIS. STAT. RULE 906.02 ("A witness may not testify *to a matter* unless evidence is introduced sufficient to support *a finding that the witness has personal knowledge of the matter.* Evidence to prove personal knowledge may, but need not, consist of the testimony of the witness. This rule is subject to the provisions of s. 907.03 relating to opinion testimony by expert witnesses.") (emphasis added). The day after the " 'someone being killed' " comment, Excel's lawyer complained to the trial court that what the lawyer was "concerned about is just the unfairness to us of having a person who was not identified as an expert offering expert testimony, especially if that person was never deposed." A little later in the transcript, Excel's lawyer appeared to withdraw whatever objection he had just made, by telling the trial court: "If they put it in through him [Schwochert], that's fine." Excel did not ask the trial court to strike whatever expert-opinion testimony Schwochert might have given.

¶ 41. By not contemporaneously objecting to any expert testimony Schwochert was asked to give, or, at the very least, seeking to have the trial court strike the allegedly offending testimony, Excel cannot now complain that receipt of that testimony was error. WISCONSIN STAT. RULE 901.03 is specific:

> Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected; and
>
> (a) *Objection.* In case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context.

Accordingly, we reject Excel's claim of trial-court error in connection with Schwochert's testimony.

2. *Testimony of Ajaib Singh.*

¶ 42. Dr. Singh is a microbiologist with the Wisconsin Department of Health. As part of his work for the Department, he had identified the *E. coli* pathogen as the cause of illness at the E&B Sizzler restaurants. Excel named him as a fact witness, not as an expert witness. Sizzler USA Franchise deposed Dr. Singh about his work and what he discovered in connection with the illness. At trial, Excel wanted to call Dr. Singh as an expert witness to testify about whether it was possible for the *E. coli* pathogen to travel in the air from meat to the food eaten by those who got sick at the E&B Sizzler restaurants. Unlike the situation with Schwochert, however, Sizzler USA Franchise and E&B objected to this proposed testimony *before* Dr. Singh testified. They argued that Dr. Singh never disclosed in any report or at his deposition that he had an opinion

194

on whether the pathogen could travel in the air from the meat to other food in the restaurants. Sustaining their objections, the trial court did not permit Dr. Singh to testify about whether the pathogen's aerosolization was possible. It explained why, and we reprint the pertinent parts of the trial court's analysis because, as noted earlier, whether to allow receipt of evidence is within the trial court's discretion:

> Dr. Singh is — will be allowed to testify as a fact witness as to the facts but will not be allowed to go beyond whatever report he submitted . . . with respect to questions as an expert microbiologist.
>
> Dr. Singh may be an expert microbiologist, but he was never designated as such and he never supplied a report as such . . . .
>
> . . . .
>
> [T]o allow Dr. Singh to testify on this question of aerosolization would, in fact, be trial by ambush . . . .
>
> . . .
>
> I want to point out one other thing: The question of aerosolization is nothing new or surprising in this case . . . . Although it hasn't been directly stated, I think it's legitimate for Excel to assert that Dr. Singh would not be called as a probative expert, but called only in rebuttal to the testimony that's already been given . . . . But as a rebuttal witness, it would still be trial by ambush to have Dr. Singh come in and testify about something that has been a key primary issue in this lawsuit, a whole — a huge really hook here as to E&B's — the possibility of E&B's negligence. And that, of course, is how did the bacteria get to the salad bar or to the watermelon.
>
> And if Excel intended to present an opinion on the subject through Dr. Singh, that opinion, the scheduling

order clearly required that that be disclosed. And not only that, but we've had years of time since the first scheduling order was issued. One year together, which we've all worked intensively to get this thing ready to go, dozens upon dozens of motions in limine. And certainly Excel could have present — could have obtained a written report and presented it to the other parties well in advance.

The trial court assessed Excel's passing argument that Dr. Singh's testimony about aerosolization would merely be "rebuttal," noting, as we see, that the issue was in the case for a long time. Thus, the trial court recognized that the matter was not new and that it did not enter the case as a surprise to Excel. This is fully consistent with established law. *See Rausch v. Buisse,* 33 Wis. 2d 154, 167, 146 N.W.2d 801, 808 (1966) ("The general rule is that the plaintiff, in his rebuttal, may only meet the new facts put in by the defendant in his case in reply."). The trial court also asked Sizzler USA Franchise and E&B: "So do you want time to depose Dr. Singh before the trial?" The question, however, was, apparently lost amidst the ensuing discussion about Dr. Singh and other witnesses, and Excel never offered that as a solution to the trial court's order preventing Dr. Singh from giving an expert opinion about aerosolization. As evident from the trial court's careful analysis, Excel's contention that the trial court erroneously exercised its discretion in connection with the testimony of Dr. Singh is without merit.

3. *Other-Acts Evidence under Wis. Stat. Rule 904.04(2)(a).*

¶ 43. Excel argues that the trial court erroneously exercised its discretion when it permitted the jury to

learn of the abysmal sanitary conditions at the Excel plant that produced the meat delivered to the E&B Sizzler restaurants. Specifically, Excel contends that the trial court should have excluded evidence of Noncompliance Records issued to the Excel plant by the Department of Agriculture for the years 1997 to 2000 because carcasses were contaminated by fecal matter, contrary to the required "zero tolerance" we discussed in *Kriefall*, 2003 WI App 119, ¶ 34, 265 Wis. 2d at 511–512, 665 N.W.2d at 435, as well as because the plant's employee-restroom facilities were horrifically unsanitary, a condition that could, according to the testimony, result in the transfer of *E. coli* from human waste to the meat being processed. As a result of the violations, the plant was both involuntarily and voluntarily shut down for short periods in 1999.

¶ 44. The trial court determined that this evidence was admissible under WIS. STAT. RULE 904.04(2)(a). The Rule provides, as material:

[E]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. This subsection does not exclude the evidence when offered for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

A trial court applying this Rule must go through a three-stage analysis: (1) "Is the other acts evidence offered for an acceptable purpose" under the Rule?; (2) "Is the other acts evidence relevant" under WIS. STAT. RULE 904.01?; and, if (1) and (2) are satisfied, (3) "Is the probative value of the other acts evidence substantially outweighed by" the factors in WIS. STAT. RULE 904.03?

*See Sullivan*, 216 Wis. 2d at 772–773, 576 N.W.2d at 32–33 (1998).[13] The trial court did that here.

¶ 45. Although opining that all nine of the examples listed in Wis. Stat. Rule 904.04(2)(a) applied, the trial court focused on three, noting that the core issue of the case was whether and to what extent Excel was negligent (in comparison with the alleged negligence of E&B and Sizzler USA Franchise): (1) "motive," that is financial gain, which the trial court explained gave context to Excel's cutting corners and having an assembly line moving the carcasses past the inspectors so fast that it was hard for them to detect fecal contamination; (2) "opportunity," that is whether Excel would have been able to correct the many problems and was negligent for not doing so; and (3) "intent," that is why Excel chose to not "eliminate the need for" issuance of the deficiency reports that

---

[13] Wisconsin Stat. Rule 904.01 provides: " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." This requires a two-step analysis: (1) is the fact for which the evidence is offered to prove "consequential"—that is, is it material to what the trial is asked to decide; and (2) is the evidence "relevant"—that is, does the evidence have "any tendency to make the existence" of a consequential fact "more probable or less probable than it would be without the evidence." *See Sims v. Great American Life Ins. Co.*, 469 F.3d 870, 881 (10th Cir. 2006) (applying Rule 401 of the Federal Rules of Evidence, which is identical to Wis. Stat. Rule 904.01).

Wisconsin Stat. Rule 904.03 provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

highlighted conditions that were conducive to the pro-
duction of contaminated meat. This is true despite
Excel's contention in its reply brief that the human-
waste evidence was not admissible because there was no
evidence "that any Excel employee was infected with
0157:H7," and no one "testified that the condition of the
restrooms caused *E. coli* contamination on any Excel
product." As we have seen, however, there *was* testimony
that human waste could contaminate meat with the
*E. coli* pathogen.

¶ 46. The trial court also opined that the "other
acts" were "relevant," the second part of the *Sullivan*
analysis. It also implicitly held that the probative value
of the "other acts" was not, to use the language of Wis.
Stat. Rule 904.03, "substantially outweighed by the
danger[s]" set out in the rule, noting that "all of the three
factors in the *Sullivan* analysis apply here." The trial
court did not erroneously exercise its discretion in deny-
ing Excel's motion *in limine* seeking to exclude the
"other-acts" evidence.

4. *Alleged Incidents of Norovirus Illness at One of
the E&B Sizzler Restaurants.*

¶ 47. Excel wanted to introduce evidence that
some patrons at one of the E&B Sizzler restaurants got
a Norovirus from poor sanitary and food-handling in
order to impeach the testimony of one of E&B's princi-
pals and an E&B manager that the E&B Sizzler restau-
rants were well-run and were safe places to eat. This is
how Excel's lawyer explained it to the trial court reading
a page of the report prepared by Excel's proposed wit-
ness:

"It is hypothesized that the Mayfair Sizzler out-
break was caused by two distinct human pathogens, the

199

Norwalk-like [Norovirus] virus and E. coli 0157:H7. Based on the incubation period, signs and symptoms of MRSR, patrons, and the case-control statistical analysis, it is most likely that the 19 patrons with shorter incubation illnesses became ill following consumption of lettuce that was contaminated with Norwalk-like virus.

There are many reports in the literature which document the transmission of Norwalk-like viruses from the bare hands of symptomatic food handler" — excuse me — "from the bare hands of symptomatic food handlers to raw fruits and vegetables.

There are also reports in the literature which document the continued shedding of Norwalk-like virus in the stool of individuals for periods of up to two weeks following cessation of diarrhea."

And then the next paragraph deals with the two laboratory-confirmed — the two lab-confirmed cases of E. coli found at Mayfair.

We set out Excel's offer-of-proof in full because an offer of proof is critical to a trial court's determination whether to receive or exclude evidence, as well as any appellate review. Thus WIS. STAT. RULE 901.03(1) provides:

Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected; and . . . . (b) *Offer of proof.* In case the ruling is one excluding evidence, the substance of the evidence was made known to the judge by offer or was apparent from the context within which questions were asked.

(Paragraphing altered.) *See also State v. Robinson*, 146 Wis. 2d 315, 329, 431 N.W.2d 165, 170 (1988) (Offer of proof requires an "evidentiary hypothesis underpinned by a sufficient statement of facts to enable [a] court to conclude with reasonable confidence that the evidentiary hypothesis could be sustained.").

██

¶ 48. The trial court denied Excel's motion to receive the Norovirus evidence, noting that "this is a trial about E. coli; it is not a trial about anything else." Further, the trial court opined that insofar as the offer-of-proof indicated that there might have been improper food handling at the E&B Sizzler restaurant, the evidence, if probative, was cumulative: "And in terms of in general what Excel might regard as sloppy practices in either of the Sizzler restaurants, there is plenty already with all the health department reports and the citation, as well as the careful, thorough cross-examination of the E&B witnesses." This is paradigm of a careful balancing under WIS. STAT. RULE 904.03 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.") The trial court did not erroneously exercise its discretion in denying Excel's motion to inject the Norovirus matter into the trial.

5. *Excel's Request that We Order a New Trial Under WIS. STAT. § 752.35.*[14]

██ ██

¶ 49. Excel asserts that "[g]iven the multiple trial errors, the real controversy was not tried." It points to

---

[14] WISCONSIN STAT. § 752.35 provides:

> In an appeal to the court of appeals, if it appears from the record that the real controversy has not been fully tried, or that it is probable that justice has for any reason miscarried, the court may reverse the judgment or order appealed from, regardless of whether the proper motion or objection appears in the record and may direct the

matters that we have already decided were not[257] trial-court error: receipt of the "other-acts evidence"; exclusion of the Norovirus evidence; not excluding parts of Schwochert's testimony; and exclusion of Dr. Singh's aerosolization testimony. Although WIS. STAT. § 752.35 gives us discretion to order a new trial if it appears from the Record that: (1) "the real controversy has not been fully tried" or; (2) "it is probable that justice has for any reason miscarried," *Vollmer v. Luety*, 156 Wis. 2d 1, 16, 456 N.W.2d 797, 804 (1990), use of that section is reserved for "exceptional cases," *State v. Cuyler*, 110 Wis. 2d 133, 141, 327 N.W.2d 662, 667 (1983). We will not order a new trial under § 752.35 where the request is based on contentions that we have already rejected, as Excel asks us to do. *See State v. Arredondo*, 2004 WI App 7, ¶ 56, 269 Wis. 2d 369, 405, 674 N.W.2d 647, 663–664. Excel's call for a new trial under § 752.35 is without merit.

D. *Verdict Form and Jury Instructions.*

1. *Jury Instruction.*

¶ 50. Our standard of review is plain:

> A trial court has broad discretion in instructing a jury but must exercise that discretion in order to fully and fairly inform the jury of the applicable rules of law. Whether a jury instruction is appropriate, under the

entry of the proper judgment or remit the case to the trial court for entry of the proper judgment or for a new trial, and direct the making of such amendments in the pleadings and the adoption of such procedure in that court, not inconsistent with statutes or rules, as are necessary to accomplish the ends of justice.

given facts of a case, is a legal issue subject to indepen-
dent review. On review, the challenged words of jury
instructions are not evaluated in isolation. Rather, jury
instructions "must be viewed in the context of the
overall charge." Relief is not warranted unless the court
is "persuaded that the instructions, when viewed as a
whole, misstated the law or misdirected the jury."

*State v. Ellington*, 2005 WI App 243, ¶ 7, 288 Wis. 2d
264, 272, 707 N.W.2d 907, 911 (quoted sources omitted).

■

¶ 51. Excel complains that the trial court told the
jury:

> A producer or manufacturer may not delegate or
> shift to a buyer or its — sorry, shift to a buyer its duty
> to produce a reasonably safe product. One who pro-
> duces an unreasonably dangerous product is not en-
> titled to expect that others will make it safe. You may
> consider this in determining whether any party was
> negligent.

This accurately stated the law, *see Deminsky v. Arlington
Plastics Machinery*, 2003 WI 15, ¶ 21, 259 Wis. 2d 587,
604–605, 657 N.W.2d 411, 420 (recognizing, however,
that although the duty to sell a product that is not
unreasonably dangerous may not be delegated, ultimate
financial liability can be shifted to another via an indem-
nity agreement), especially since here, as we have al-
ready pointed out, Excel could not under the law sell
contaminated meat. Excel complains, however, that the
"instruction incorrectly instructed that Excel could be
found liable even if E&B's and [Sizzler USA Franchise]'s
negligence contributed to the injury." But that is what
the law requires when the negligence of more than one
party may be a cause of an injury. Thus, the trial court
correctly told the jury that restaurants *also* have a duty

"to exercise ordinary care in the preparation and processing of [sold or served] food so as to render the [food] reasonably safe for human consumption." The trial court explained to the jury:

> The test in determining whether a restaurant operator is negligent in permitting harmful substances to remain in the final food product is not whether the substance may have been natural or proper at some time in the preparation of the food but whether the presence of such substance is natural and ordinarily expected to be found on the final product as served.

> A restaurant operator is not an [i]nsurer of the reasonable fitness for human consumption of the food prepared by him or her for the sale or service but has a duty of ordinary care to eliminate, remove — eliminate or remove, during the preparation of the food he or she serves or sells, such harmful natural substance as the consumer of the food, as served, would not ordinarily anticipate and guard against.

> . . . .

> In certain circumstances, a franchisor has a duty to exercise ordinary care in the supervision of its franchisees. To find that a franchisor negligently supervised its franchisee, you must find, one, that the franchisor retained some supervisory control over the manner in which the franchisee's work was done; two, that the franchisee committed a wrongful act; and, three, that the franchisor's failure to exercise ordinary care was caused by [*sic*—probably should be "was a cause of"] the franchisee's wrongful act.[15]

---

[15] None of the parties contend that the sentence reflected in the transcript (". . .three, that the franchisor's failure to exercise ordinary care was caused by [*sic*—probably should be "was a cause of"] the franchisee's wrongful act) affected the trial or verdict.

As we have seen, the jury apportioned causal negligence for the *E. coli*-contamination between Excel and E&B, and found that Sizzler USA Franchise, the franchisor, was not negligent at all. On our *de novo* review of the legal matter in the instructions, we agree that the trial court fully and thoughtfully exercised its discretion in telling the jury about standards it had to apply.

### 2. *Jury Verdict.*

¶ 52. Excel complains that the trial court did not put on the verdict or tell the jury that the Kriefall plaintiffs settled the case for $8.5 million, pointing out that ordinarily a jury is asked to determine whether a settlement is reasonable. *See United States Fidelity & Guaranty Co. v. Milwaukee & Suburban Transport Corp.*, 18 Wis. 2d 1, 13, 117 N.W.2d 708, 715 (1962) ("The joint tort-feasor's liability [in contribution] is based in part on the reasonableness of the settlements. To find whether the settlements were reasonable is properly within the scope of the jury. Any competent evidence is admissible showing the amounts of the settlements or their reasonableness and, likewise, their unreasonableness."). The trial court recognized the general rule, but determined that *as a matter of law* the $8.5 million was *not* reasonable: "The evidence of Brianna Kriefall's pain and suffering is not sufficient to support $8.5 million in recovery. No reasonable jury could make that determination. Even if you add 500,000 for the loss of society and companionship for the parents, that's not possible." (Paragraphing altered.)

¶ 53. It is axiomatic that a trial court may only let the jury decide an issue if there is evidence in the Record that would support the answer sought by the proponent. *See Berner Cheese Corp. v. Krug*, 2008 WI

95, ¶ 66, 312 Wis. 2d 251, 280, 752 N.W.2d 800, 815. In essence, the decision the trial court must make is akin to a decision whether to grant or deny a motion for summary judgment, where the proponent must show that there is enough evidence to get a trial on an issue. *See Transportation Ins. Co. v. Hunzinger Constr. Co.*, 179 Wis. 2d 281, 291–292, 507 N.W.2d 136, 140 (Ct. App. 1993) (burden of demonstrating sufficient evidence to go to trial on party who has burden of proof on issue at trial). Here, the trial court determined that there was *not* sufficient evidence to support an $8.5 million award to the Kriefalls. Although Excel says this was error, it does not even attempt to show that there was sufficient evidence to support an $8.5 million award. Thus it has not shown that the trial court erred, whether our review of that issue is *de novo* (as it would be in a review of a decision to grant or deny summary judgment—*see Flejter v. West Bend Mut. Ins. Co.*, 2010 WI App 174, ¶ 5, 330 Wis. 2d 721, 727, 793 N.W.2d 913, 915) or deferential.

¶ 54. Further, as we have already seen, whether to receive evidence is within the trial court's discretion and subject to the balancing required by Wis. STAT. RULE 904.03. The trial court in essence also determined under the unique circumstances it identified that allowing the jury to see what the Kriefalls were paid to settle their claims, and allow argument as to whether *that* amount was right or fair or justified, would divert the jury's real task of deciding what *was* a reasonable settlement. The trial court did not erroneously exercise its discretion in making this determination.[16]

---

[16] Excel also has this one-sentence assertion in the "jury verdict" part of its main brief on this appeal: "The court also

## II.

## (Cross-Appeal by E&B and Secura)

A. *Sufficiency of the Evidence to Support the Jury's Finding that E&B was 20% Causally Negligent for the E. coli-related Injuries to the Patrons of its Sizzler Restaurants.*

¶ 55. E&B contends that there was insufficient evidence for the jury to find that it was causally negligent. It focuses on what it argues was the lack of expert testimony tying the *E. coli*-contamination of E&B's non-meat products to what E&B did or did not do to. We disagree.

¶ 56. Our review of a jury's verdict is circumscribed by the realization that a jury is better able to get a sense of the trial's flow and the witness's credibility than is an appellate court faced with a transcript:

> The scope of our review of the jury's verdict is narrow. "No motion challenging the sufficiency of the evidence as a matter of law to support a verdict, or an answer in a verdict, shall be granted unless the court is satisfied that, considering all credible evidence and reasonable inferences therefrom in the light most favorable to the party against whom the motion is made, there is no credible evidence to sustain a finding in

erroneously ruled that Excel and American Home had no right of contribution or equitable indemnity for the $2 million paid to settle Kriefall claims on behalf of E&B." We ignore wholly undeveloped "arguments," *see League of Women Voters v. Madison Community Foundation*, 2005 WI App 239, ¶ 19, 288 Wis. 2d 128, 140, 707 N.W.2d 285, 291; we ignore this one as well.

favor of such party." RULE 805.14(1), Stats. Special deference is given to a jury verdict that is approved by the trial court. Thus, where, as here, the trial court has approved the jury verdict, the scope of our review is even narrower: the verdict may not be overturned unless "there is such a complete failure of proof that the verdict must be based on speculation."

*Kuklinski v. Rodriguez*, 203 Wis. 2d 324, 331, 552 N.W.2d 869, 872 (Ct. App. 1996) (other than to RULE 805.14(1), citations and quoted sources, omitted). Further, in reviewing a verdict to ascertain whether, under our very narrow scope of review, there is sufficient evidence to support a verdict, we must also see whether circumstantial evidence supports the verdict—this is the rule even in criminal cases, where, of course, a jury may not find a defendant guilty unless the evidence proves the defendant's guilt beyond a reasonable doubt (as opposed to the much lower preponderance-of-the-evidence standard applicable here). *See State v. Poellinger*, 153 Wis. 2d 493, 507–508, 451 N.W.2d 752, 758 (1990). Thus, *Poellinger* teaches "that circumstantial evidence is oftentimes stronger and more satisfactory than direct evidence." *Id.*, 153 Wis. 2d at 501, 451 N.W.2d at 755. Finally, in assessing a jury verdict we must look for evidence that will support it, not overturn it. *Reuben v. Koppen*, 2010 WI App 63, ¶ 19, 324 Wis. 2d 758, 774, 784 N.W.2d 703, 711. There was no "complete failure of proof" supporting the jury's finding that E&B was contributorily negligent; indeed the evidence was far more than sufficient.

¶ 57. As material, our analysis has two parts: (1) Whether there was sufficient evidence that E&B knew or should have known that using knives and cutting boards to both prepare raw meat and foods that would not be cooked—here, fruits and vegetables—

could result in dangerous cross-contamination, that is the contamination of the fruits and vegetables from pathogens on the meat; and (2) Whether there was sufficient evidence that E&B permitted its employees to use knives and cutting boards for both raw meat and fruits and vegetables. The answer to both these inquiries is "yes."

1.

¶ 58. The jury heard from John Antosiewicz, who had extensive experience in the restaurant business. He was:

- a "manager' with Rustler Steakhouse, which Antosiewicz said was taken over by "Sizzler" in 1985;[17]

- a Sizzler "[s]ystem manager, restaurant manager, training unit manager, regional training supervisor, [and] franchise consultant" from 1985 to 2003;[18]

- "certified to be an instructor" in a Food and Drug Administration "Serve Safe" food code that was a "[Hazard Analysis and Critical Control Point] guidelines, food safety and sanitation" system for restaurants.

Antosiewicz was a "franchise consultant" with Sizzler in 1999 and 2000. As such, he "was dealing with" the E&B Sizzler restaurants within "[a] year or two" before the *E. coli* outbreak at the restaurants in the summer of 2000. He testified that his job in connection with the E&B Sizzler restaurants was "[t]o visit the restaurants,

---

[17] Antosiewicz did not say which "Sizzler" entity took over Rustler Steakhouse.

[18] Antosiewicz said that the title "franchise consultant" was, during his tenure, changed to "franchise market manager."

do their operations evaluations, assist the franchisee in any way I could to help improve their operations, profitability." He described one of the critical aspects of food-safety handling as set out in a September 1998 restaurant Hazard Analysis and Critical Control Point checklist:

> [D]ifferent food groups should be handled separately. After preparing one of those items, the area should be cleaned and sanitized prior to preparing a different type of item. Especially high protein items such as beef and chicken should be separate from lettuces and salad bar items and things like that.

Antosiewicz explained that separation was necessary, "[b]ecause different foods contain different bacterias and can be transmitted into other foods and sometimes bacteria can grow more rapidly and, you know, in certain types of foods." He said that he knew all of this before "the summer of 2000." Antosiewicz also testified that in 1998, "Sizzler" told its franchisees to follow the Hazard Analysis and Critical Control Point in connection with the handling food.

¶ 59. E&B does not question Antosiewicz's ability to testify under the then extant version of WIS. STAT. RULE 907.02.[19] E&B also does not dispute that it was told the things Antosiewicz said it was told. Moreover, and significantly, the label on the Excel meat delivered to the E&B restaurants warned:

---

[19] As noted, effective for actions commenced on or after February 1, 2011, new WIS. STAT. RULE 907.02 applies. WISCONSIN STAT. RULE 907.02 in effect for this trial read: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

> Some food products may contain bacteria that could cause illness if the product is mishandled or cooked improperly. For your protection, follow these safe handling instructions.
>
> . . . .
>
> Keep raw meat and poultry separate from other foods. Wash working surfaces (including cutting boards), utensils, and hands after touching raw meat or poultry.

The jury thus had sufficient evidence that restaurant managers either knew or should have known that meat should be kept away "from lettuce and salad bar" foods. ██ ██

¶ 60. Further, although Antosiewicz was a qualified expert witness, "expert testimony is *required* only if the issue to be decided by the jury is beyond the general knowledge and experience of the average juror." *State v. Whitaker*, 167 Wis. 2d 247, 255, 481 N.W.2d 649, 652 (Ct. App. 1992) (emphasis by *Whitaker*). The need to keep raw meat away from foods that are not going to be cooked is something within an average juror's "general knowledge and experience," especially given the drumbeat of warnings about cross-contamination that pervades the media, a matter about which we can take judicial notice. *See* WIS. STAT. RULE 902.01(3) ("A judge or court may take judicial notice, whether requested or not.").[20] Thus, a federal-government site on food safety advises that "The *Basics*" are: Clean, Separate, Cook

---

[20] WISCONSIN STAT. RULE 902.01 reads in full:

> (1) SCOPE. This section governs only judicial notice of adjudicative facts.
>
> (2) KINDS OF FACTS. A judicially noticed fact must be one not subject to reasonable dispute in that it is any of the following:

211

and Chill." http://foodsafety.gov/keep/basics/index.html (last visited June 1, 2011) (emphasis added).

2.

¶ 61. The jury also had extensive evidence that E&B did not heed the warnings on the Excel label and keep separate from salad-bar items equipment used to prepare raw meat. Thus, a report prepared by the Communicable Disease Epidemiology Section of the Wisconsin Division of Public Health's Bureau of Communicable Diseases in the Wisconsin Department of Health and Family Services, indicates that its investigators looking into the "Outbreak of Gastrointestinal Illness at the Mayfair Road Sizzler Restaurant, Wauwatosa, WI; July – August, 2000" either saw or were told by E&B employees:

(a) A fact generally known within the territorial jurisdiction of the trial court.

(b) A fact capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.

(3) WHEN DISCRETIONARY. A judge or court may take judicial notice, whether requested or not.

(4) WHEN MANDATORY. A judge or court shall take judicial notice if requested by a party and supplied with the necessary information.

(5) Opportunity to be heard. A party is entitled upon timely request to an opportunity to be heard as to the propriety of taking judicial notice and the tenor of the matter noticed. In the absence of prior notification, the request may be made after judicial notice has been taken.

(6) TIME OF TAKING NOTICE. Judicial notice may be taken at any stage of the proceeding.

(7) INSTRUCTING JURY. The judge shall instruct the jury to accept as established any facts judicially noticed.

212

- "Vegetables (lettuce) are routinely washed and chopped in the same room that meat is tenderized in."

- A person working at the restaurant's salad bar told an investigator, as phrased by the Report: "Cutting boards should be checked, she thinks meat cutter uses same board to cut meat and ready-to-eat foods."

- A "slicer was used for raw rib-eye meats and ready-to-eat foods. It contained observed food debris."[21]

- "(In the general preparation line of counters area, where salads are prepared.) The Hobart mixer had the meat grinder attached to it at this time. When asked what it was used for, the manager revealed that the leftover raw meat and meat tips were ground for the taco meat with this attachment. This occurs 1 or 2 times/week. When asked what occurs in the bowl of the Hobart mixer (directly beneath the grinder), the manager revealed that butter/cream was whipped there. The bowl had a metal spatter guard on it that covered about a two-inch periphery of the bowl. It would be difficult to observe the contents of the bowl with the spatter guard attached. (*Dripped raw meat juices or meat debris in the bowl would be unnoticeable, even to the user of the grinder with this bowl and guard attached!)." (Asterisk and parentheticals in original.)

- "Raw meat was being processed in the same area as the processing of ready-to-eat salad ingredients."

---

[21] We understand that the *E. coli*-contaminated meat was not "rib-eye" beef. Nevertheless, evidence that a slicer was used for *both* raw meat and ready-to-eat foods is something that the jury could consider in determining whether the food-handling practices complied with a restaurant's duty under the ordinary-care standard to keep raw meat separate from food that was not going to be cooked.

213

- "The lettuce chopper was located in the meat room on the counter where meat processing occurred."

- "The only lettuce/vegetable cleaning sink was located in the meat room."

- "There was no handwash sink in the meat room."

- "There would be concerns for employees using the sink in the meat room for interchangeable handwashing and food cleaning."

Among other things, the Report recommended that "*Designated cutting boards* should be used, cleaned and stored separately. Interchangeable use *should be discontinued.*" (Underlining in original; emphasis added.).[22]

[22] E&B contends on appeal (it does not tell us that it made this objection at trial, or, if it did, where in the Record it made the objection) that we should disregard the Department reports because, as E&B's reply brief opines, "[t]he state reports were not prepared for purposes of litigation," as if this vitiates rather than, as it does, enhances its reliability. *See Palmer v. Hoffman*, 318 U.S. 109, 111–114 (1943); *State v. Williams*, 2002 WI 58, ¶ 38, 253 Wis. 2d 99, 120, 644 N.W.2d 919, 929. Moreover, WIS. STAT. RULE 908.03(8) provides that government "reports ... setting forth ... (c) in civil cases ... factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness" is excepted from the rule against hearsay. RULE 908.03(8)(c) encompasses opinions that are fairly based on the investigation. *See Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 170 (1988) (applying Rule 803(8)(c) of the Federal Rules of Evidence, from which RULE 908.03(8)(c) was copied). Additionally, things that E&B employees told the investigators compiling the Report are specifically excluded from the rule against hearsay by WIS. STAT. RULE 908.01(4)(b)1., 3., or 4., or all of the subsections. Thus, a "statement" is not hearsay under RULE 908.01(4)(b) if it is "offered against a party and is": "1. The party's own statement ... or .... 3. A statement by a person authorized by

¶ 62. Mary Proctor, Ph.D., who, when she was a supervisor in the Communicable Disease Epidemiological Section, had a significant role in preparing the reports in connection with the gastrointestinal-illness outbreaks at the E&B Sizzler restaurants, testified that taco meat, which tested positive for *E. coli* 0157:H7, "was the source for the 0157:H7 in the [Layton Avenue E&B Sizzler] restaurant." As we have seen, the Report indicated that an E&B manager admitted that the Hobart mixer was used to both grind taco meat and whip "butter/cream." Dr. Proctor also testified:

- The *E. coli* outbreak at the Mayfair E&B Sizzler restaurant was caused by cross-contamination of multiple salad bar items with raw meat.

- That in both E&B Sizzler restaurants there were the following food-safety problems: "Raw food being prepared on chopping boards right next to a grinder where meat was prepared; using the same knives for cutting raw produce with meat product; stirring; cutting boards and knives in standing water so that they could become cross-contaminated; lack of adequate hand-washing after handling meat products and the handling of other things."

- The Mayfair Sizzler outbreak, as the Report, as read to her during her testimony indicated, " 'was caused by cross-contamination of multiple salad bar items with raw meat.' "

- The Layton Avenue Sizzler outbreak, as the Report, as read to her during her testimony indicated, was

the party to make a statement concerning the subject [employees authorized by E&B to talk to the investigators], or 4. A statement by the party's agent or servant concerning a matter within the scope of the agent's or servant's agency or employment, made during the existence of the relationship." (Paragraphing altered.)

> also caused by the handling in the restaurant of raw Excel meat: " 'Cross-contamination of fresh watermelon with raw meat product was the mechanism by which the vehicle [that is, the vehicle for the infection—the watermelon] became contaminated, and the raw [Excel] sirloin tri-tips were the source of the E. coli 0157:H7 organisms in this outbreak.' "

Dr. Porter then explained why the food-handling layout of both the E&B Sizzler restaurants was unsafe:

> The fact that, as I mentioned very early on this morning, the cutting up the raw fruit and vegetables on cutting boards next to the mixer where the taco meat would be ground, storing cutting boards and knives in water in the sink, using them for both meat and for — you don't have a designated knife for meat and a designated one for raw produce.

There was more than enough evidence to support the jury's verdict that E&B was contributorily negligent.

B. *Whether Excel's Guaranty to Never Ship Contaminated Meat Made E&B Not Negligent as a Matter of Law.*

¶ 63. E&B contends that because, as *Deminsky* recognized, a manufacturer of an unsafe product cannot delegate to a buyer its duty to make a safe product, Excel's undertaking to produce pathogen-free meat relieves E&B from its causal contributory negligence for the illness suffered by E&B's patrons. *See Deminsky*, 2003 WI 15, ¶ 21, 259 Wis. 2d at 604–605, 657 N.W.2d at 420. E&B seeks to have us "hold that, as a matter of law, Excel may not reduce its indemnification obligation under the 1993 Agreement because it delivered adulterated meat." This contention is a non-starter.

216

¶ 64. First, as we have seen, the 1993 Hold Harmless Agreement specifically provided that "[Excel]'s indemnification obligations hereunder shall not apply *to the extent* that Claims are caused by the negligent acts or omissions of [Sysco] or any other third party." (Emphasis added.) As we have already seen, E&B does not contend that it is not an "other third party." The jury found that to "the extent" of twenty-percent, E&B's negligence caused the injuries (or, as the Agreement refers to such matters, "Claims").

¶ 65. Second, holding E&B twenty-percent responsible for the "Claims" does not impose a duty on *it* to make Excel's meat safe; holding E&B causally negligent merely recognizes that E&B's negligence created the opportunity for Excel's unsafe meat to actually cause harm. Here, the jury found a confluence of events jointly caused the "injuries": *E. coli*-tainted meat *and* E&B's unsafe food handling. E&B's contention that it is relieved as a matter of law of its contributory responsibility for the "Claims" is without merit.

C. *Excel's Claim Against E&B for Contribution.*

¶ 66. As we have seen, under the Hold Harmless Agreement, Excel promised to indemnify E&B for "Claims" but only "to the extent" that the damages for those "Claims" were not caused by E&B's negligence. Pursuant to this undertaking, Excel settled claims asserted by the Kriefall plaintiffs, and sought contribution from E&B because, Excel contended, Excel paid more than its fair share (100% rather than 80%) in light of the jury's finding that E&B was twenty-percent causally negligent with respect to those claims. E&B argues that the trial court erroneously refused to dismiss Excel's claim for contribution in connection with

the Kriefall settlement, contending, as phrased by its main brief on this appeal, that "Excel reserved only the right to reduce its indemnification obligation — to the extent that it proves third-party [E&B] causal negligence." We disagree.

> A right to contribution may be based on an express contract between the parties. It may also arise by operation of law to rectify an inequity resulting when a co-obligor pays more than a fair share of a common obligation. In the latter instance, the contract is implied by law. When no express agreement confers a right of contribution, a partys right to seek contribution against another is premised on two conditions: (1) the parties must be liable for the same obligation; and (2) the party seeking contribution must have paid more than a fair share of the obligation.

*Kafka v. Pope*, 194 Wis. 2d 234, 242–243, 533 N.W.2d 491, 494 (1995) (footnote and internal citation omitted). Thus, a party that pays more than it contracted to pay under a guaranty may recover in contribution against the other party to the guaranty if the first party paid more than its fair share of the obligation.

¶ 67. E&B disputes the rule we see in *Kafka,* however, and relies on RESTATEMENT (SECOND) TORTS § 866A(4) for the proposition that *any* indemnification agreement cuts off *any* right to contribution: "When one tortfeasor has a right of indemnity against another, neither of them has a right of contribution against the other." But this *only* applies when the "indemnity" is for the *full amount* of the liability, which, of course, is not the case here. *See* RESTATEMENT (SECOND) TORTS § 866A cmt. 4 ("Indemnity, which shifts the entire loss from one tortfeasor to another, and contribution, which shifts only a proportionate share of that loss, are mutually inconsistent remedies. When there is a right of indem-

nity, it controls, and neither tortfeasor has a right of contribution against the other."). This is the same reason why *Callahan v. A.J. Welch Equipment Corp.*, 634 N.E.2d 134 (Mass. App. Ct. 1994), relied on by E&B also is not helpful. *Callahan* denied contribution because the party seeking contribution agreed to totally indemnify the party from whom it sought contribution; a Massachusetts statute made total indemnity and contribution mutually exclusive remedies. *Id.*, 634 N.E.2d at 138 ("General Laws c. 231B, § 1(e) simply provides that there is no contribution in cases where a right of indemnity exists."). We set out the entire section in the footnote.[23]

---

[23] MASSACHUSETTS GEN. LAWS ch. 231B, § 1 reads in full:

(*a*) Except as otherwise provided in this chapter, where two or more persons become jointly liable in tort for the same injury to person or property, there shall be a right of contribution among them even though judgment has not been recovered against all or any of them.

(*b*) The right of contribution shall exist only in favor of a joint tortfeasor, hereinafter called tortfeasor, who has paid more than his pro rata share of the common liability, and his total recovery shall be limited to the amount paid by him in excess of his pro rata share. No tortfeasor shall be compelled to make contribution beyond his own pro rata share of the entire liability.

(*c*) A tortfeasor who enters into a settlement with a claimant shall not be entitled to recover contribution from another tortfeasor in respect to any amount paid in a settlement which is in excess of what was reasonable.

(*d*) A liability insurer, who by payment has discharged in full or in part the liability of a tortfeasor and has thereby discharged in full its obligation as insurer, shall be subrogated to the tortfeasor's right of contribution to the extent of the amount it has paid in excess of the tortfeasor's pro rata share of the common liability. This provision shall not limit or impair any right of subrogation arising from any other relationship.

¶ 68. Here, Excel had an obligation to indemnify E&B to the extent that E&B's negligence did not cause the damages. The Record indicates that it paid the full amount of the settlement with the Kriefall plaintiffs. Indeed, as we have seen, E&B sought indemnity from, and to tender its defense to, Excel under the Hold Harmless Agreement. As we have also seen, Excel acquiesced "under a reservation of rights," which, among other things, contended "that the 1993 Hold Harmless Agreement and Guaranty/Warranty of Product" did not apply. In any event, Excel's contribution claim against E&B is limited to the amount Excel paid in settlement that was more than Excel's fair share of what must be a "reasonable settlement." *See Fire Ins. Exchange v. Cincinnati Ins. Co.*, 2000 WI App 82, ¶ 8, 234 Wis. 2d 314, 322, 610 N.W.2d 98, 103 (A "settling party" seeking contribution must "prove that: (1) both parties were obligated to the payee; (2) the amount of the payment was reasonable; and (3) the proportionate fault with negligent tortfeasors.") The trial court did not err in refusing to dismiss Excel's contribution claims against E&B.[24]

---

(e) This chapter shall not impair any right of indemnity under existing law. Where one tortfeasor is entitled to indemnity from another, the right of the indemnity obligee shall be for indemnity and not contribution, and the indemnity obligor shall not be entitled to contribution from the obligee for any portion of his indemnity obligation.

[24] We reject E&B's contention that permitting Excel to get contribution to the extent of E&B's negligence is "inequitable." Given the jury's finding that E&B contributed significantly to the illness of its patrons, we see nothing inequitable in permitting Excel to recover from E&B what Excel overpaid. Although spanning some three pages in its brief, E&B's "inequitable" contention is largely undeveloped except for

·ʃ

⬛

D. *E&B's Claim for Business Damages.*

⬛

¶ 69. E&B contends that the trial court erred in not concluding that the 1993 Hold Harmless Agreement covered E&B's business losses and not just money that E&B might owe in connection with claims asserted by injured persons. We disagree.

¶ 70. As we have seen, under the Hold Harmless Agreement, as material to this part of the opinion, Excel "agree[d] to defend, indemnify and hold harmless [E&B] from all actions suits, claims and proceedings ("Claims"), and any judgments, damages, fines, costs and expenses (including reasonable attorneys' fees) resulting therefrom." As we have also seen, the Agreement covered claims:

> (ii) brought or commenced by any person or entity against any [customer] for the recovery of damages for the injury, illness and/or death of any person or damage to property arising out of or alleged to have arisen out of (a) the delivery, sale, resale, labeling, use or consumption of any Product, or (b) the negligent acts or omissions of [Excel]; provided, however, that [Excel]'s indemnification obligations hereunder shall not apply to the extent that Claims are caused by the negligent acts or omissions of [E&B].

E&B's contention that the Agreement is not limited to "damages for the injury, illness and/or death of any person or damage to property," is belied by the words, which set the parameters of what the Agreement covered because the "damages, fines, costs and expenses (including reasonable attorneys' fees)" is not a stand-

rhetoric and angry assertions that fault Excel for its initial litigation strategy of denying that its meat was a cause of the illnesses.

alone listing, but, rather, is tied to "*resulting therefrom.*" (Emphasis added.) This means, as the trial court pointed out, that the items in the listing *must be consequential to personal-injury or property-damage claims.* On our *de novo* review of the trial court's application of the Agreement's clear language, we affirm its denial of E&B's request for business damages that did not flow from the personal-injury "Claims."

E. *E&B's Motion to Amend its Complaint Against Excel to Add a Claim for Breach of Implied Warranty.*

¶ 71. E&B sought to amend its complaint some three years after the time for doing so expired. The trial court, however, did not deny E&B's motion because it was untimely, but, rather, denied it because it viewed the implied-warranty claim E&B sought to assert against Excel as not a "viable cause of action." On our *de novo* review of this legal issue, we agree.

¶ 72. "Wisconsin has always required privity of contract in an action for a breach of implied warranty." *Dippel v. Sciano*, 37 Wis. 2d 443, 449, 155 N.W.2d 55, 57 (1967). Wisconsin still does, *see Northridge Co. v. W.R. Grace and Co.*, 162 Wis. 2d 918, 938 n.15, 471 N.W.2d 179, 187 n.15 (1991), and we are bound, of course, by supreme court decisions, *State v. Jones*, 2010 WI App 133, ¶ 21, 329 Wis. 2d 498, 510, 791 N.W.2d 390, 396. Although E&B was a foreseeable, indeed, an intended, recipient of the Excel meat, Excel's contracts were with Sizzler International and Sysco, not E&B: The 1997 Continuing Guarantee was between Excel and Sizzler International, and, as we have already seen, the Continuing Guarantee excludes liability for "consequential damages." The 1993 Hold Harmless Agreement was between Excel and Sysco, and was also for the benefit of

Sysco's customers, which includes E&B. Although, of course, this would make E&B an intended beneficiary of the Hold Harmless Agreement, E&B *was already covered by its terms*. Third-party beneficiaries (and E&B asserts that it is one), succeed to the rights of the contract that is intended to benefit them, and nothing more. *See Milwaukee Area Technical College v. Frontier Adjusters of Milwaukee*, 2008 WI App 76, ¶ 20, 312 Wis. 2d 360, 377, 752 N.W.2d 396, 404 ("A person may enforce a contract as third-party beneficiary if the contract indicates that he or she was either specifically intended by the contracting parties to benefit from the contract or is a member of the class the parties intended to benefit."). It would also distort the law if an intended beneficiary of an express warranty *that excluded damages* sought by the intended beneficiary (as does the Continuing Guarantee) could boot-strap entitlement to those damages through that express warranty. Stated another way, as recognized by *AT&T Mobility LLC v. Concepcion*, 563 U.S. \_\_\_, 131 S. Ct. 1740 (2011), it makes no sense to have something (in our case, an express warranty; in *AT&T Mobility*, a statute) that negates a remedy only to have that something be a conduit for the enforcement of that remedy. *See id.*, 563 U.S. at \_\_\_, 131 S. Ct. at 1748 ("In other words, the act cannot be held to destroy itself.") (internal quotation marks and quoted sources omitted) (applying the Federal Arbitration Act, 9 U.S.C. §§ 1–16). We affirm the trial court's denial of E&B's motion to amend.

F. *Offer-of-Settlement Interest.*

¶ 73. By offer of settlement dated March 23, 2007, sent to Excel, Secura offered "to settle all claims asserted against" Excel for $1,850,000. By virtue of that offer, Secura seeks 12% interest on $800,000 under Wis.

STAT. § 807.01(4).[25] The $800,000 is eighty-percent of the $1 million dollars that, as we have already dis-

[25] WISCONSIN STAT. § 807.01 provides:

(1) After issue is joined but at least 20 days before the trial, the defendant may serve upon the plaintiff a written offer to allow judgment to be taken against the defendant for the sum, or property, or to the effect therein specified, with costs. If the plaintiff accepts the offer and serves notice thereof in writing, before trial and within 10 days after receipt of the offer, the plaintiff may file the offer, with proof of service of the notice of acceptance, and the clerk must thereupon enter judgment accordingly. If notice of acceptance is not given, the offer cannot be given as evidence nor mentioned on the trial. If the offer of judgment is not accepted and the plaintiff fails to recover a more favorable judgment, the plaintiff shall not recover costs but defendant shall recover costs to be computed on the demand of the complaint.

(2) After issue is joined but at least 20 days before trial, the defendant may serve upon the plaintiff a written offer that if the defendant fails in the defense the damages be assessed at a specified sum. If the plaintiff accepts the offer and serves notice thereof in writing before trial and within 10 days after receipt of the offer and prevails upon the trial, either party may file proof of service of the offer and acceptance and the damages will be assessed accordingly. If notice of acceptance is not given, the offer cannot be given as evidence nor mentioned on the trial. If the offer is not accepted and if damages assessed in favor of the plaintiff do not exceed the damages offered, neither party shall recover costs.

(3) After issue is joined but at least 20 days before trial, the plaintiff may serve upon the defendant a written offer of settlement for the sum, or property, or to the effect therein specified, with costs. If the defendant accepts the offer and serves notice thereof in writing, before trial and within 10 days after receipt of the offer, the defendant may file the offer, with proof of service of the notice of acceptance, with the clerk of court. If notice of acceptance is not given, the offer cannot be given as evidence nor mentioned on the trial. If the offer of settlement is not accepted and the plaintiff recovers a more favorable judgment, the plaintiff shall recover double the amount of the taxable costs.

cussed, Federal Insurance paid to Secura to help Secura settle with the non-Kriefall claimants. The $800,000 came into play in connection with the § 807.01(4) offer of settlement because, as we have also seen, the trial court held that Secura was entitled to recover that money from Excel although, it was, as we have pointed out, essentially a gift to Secura because Federal Insurance never sought to get it back from Secura or to recover the money from Excel. In light of our ruling that the trial court erred in letting Secura recover the money from Excel, the offer-of-settlement issue is moot.

## III.

### (Cross-Appeal by Sizzler USA Franchise)

A. *Continuing Guaranty.*

¶ 74. Sizzler USA Franchise complains that the trial court improperly enforced the provision in the 1997 Continuing Guaranty that excluded "incidental or consequential damages," claiming that, contrary to the trial court's conclusion, the exclusion was "unconscionable" and, therefore, not enforceable. In light of our determination that Sizzler USA Franchise may recover its incidental and consequential damages *via* the implied-warranty route mapped by the Uniform Commercial Code, discussed earlier, whether the trial court correctly upheld the exclusion clause in the Continuing Guaranty is moot. *See Gross*, 227 Wis. at 300, 277 N.W. at 665 (only dispositive issue need be addressed).

---

(4) If there is an offer of settlement by a party under this section which is not accepted and the party recovers a judgment which is greater than or equal to the amount specified in the offer of settlement, the party is entitled to interest at the annual rate of 12% on the amount recovered from the date of the offer of settlement until the amount is paid. Interest under this section is in lieu of interest computed under ss. 814.04(4) and 815.05(8).

### B. *Equitable Indemnity.*

¶ 75. Sizzler USA Franchise also contends that the trial court erred when it would not apply equitable indemnity to permit Sizzler USA Franchise to get from Excel the $1.5 million it paid upfront to the Kriefall family. In its oral decision on Sizzler USA Franchise's equitable-indemnity request, the trial court noted that the jury had considered whether Sizzler USA Franchise should be reimbursed for that money:

> In the course of the trial, the jury determined that Sizzler USA [Franchise] was — did suffer the loss of profits, six and a half million dollars of profits, the loss of franchise royalties, $350,000 and out-of-pocket expenses as a result of the outbreak [attributable] to the negligent parties. One of the out-of-pocket expenses presented to the jury for this consideration was this one and a half million dollars in advance payment made to the Kriefall family based upon a mathematical calculation of the out-of-pocket expenses that were presented by Sizzler USA [Franchise] to the jury.

> It is evident that the jury chose to compensate Sizzler USA [Franchise] for the line item out-of-pocket expenses advocated by [Sizzler USA Franchise's lawyer] on behalf of Sizzler [USA Franchise] except for the one and a half million dollars advance payment.

The trial court then analyzed whether it should "as a separate and distinct matter of law and exercise of discretion," "make a determination that in fairness and equity that Sizzler [USA Franchise] is entitled to reimbursement of that money along with its reasonable attorney fees." The trial court held that Sizzler USA Franchise was not entitled to the reimbursement. The trial court did not rely on the jury's rejection of the

claim, and Excel does not argue that the jury's rejection makes equitable indemnity unavailable.

¶ 76. Equitable indemnity kicks in when " 'one person is exposed to liability by the wrongful act of another in which he does not join.' " *Brown v. LaChance,* 165 Wis. 2d 52, 64, 477 N.W.2d 296, 302 (Ct. App. 1991) (quoted source omitted). As we have seen, the jury vindicated Sizzler USA Franchise's contentions that it was not liable for the *E. coli*-contamination and the resulting death of Brianna Kriefall and the illnesses of the other patrons of the two E&B Sizzler restaurants. It thus can be fairly said that the jury determined that Sizzler USA Franchise did "not join" in the "wrongful act[s]" of the others found to be causally negligent for the contamination.

¶ 77. Sizzler USA Franchise paid the $1.5 million pursuant to a document titled "Advance Partial Payment Pursuant to Sec. 885.285 Wis. Stats." (Uppercasing omitted.)[26] As can be seen from the statute, which we reprint in the footnote, the statute does not answer the question whether someone who makes a payment seeking the protections afforded by that provision is entitled to recoupment from a tortfeasor found to be

---

[26] WISCONSIN STAT. § 885.285 provides:

**(1)** No admission of liability shall be inferred from the following:

(a) A settlement with or any payment made to an injured person, or to another on behalf of any injured person, or any person entitled to recover damages on account of injury or death of such person; or

(b) A settlement with or any payment made to a person or on the person's behalf to another for injury to or destruction of property.

227

more liable than the payor. Excel argues that Sizzler USA Franchise was a mere volunteer and paid the money out of the goodness of its corporate heart, and points to testimony by Sizzler USA Franchise's chief executive officer, who said that the Kriefall tragedy significantly affected the company and its board of directors:

> [I]t is a very emotional thing. And as a board, we met and talked about it, and the feeling was we should do everything we could do, but at the same time we didn't want to overreact and look like we're guilty parties in this thing. We felt responsible but we didn't feel that it was our fault.
>
> And so we contact the Kriefalls' minister and we volunteered to help the family in any way we could but to do it anonymously so that it didn't look like we were trying to buy off the family.
>
> And they ended up accepting help for their relatives to come to the funeral, but that was the only thing that they said that they needed or wanted at that time.

When asked whether the company "ultimately ma[d]e a payment to the Kriefalls," Sizzler USA Franchise's chief

---

(2) Any settlement or payment under sub. (1) is not admissible in any legal action unless pleaded as a defense.

(3) Any settlement or advance payment under sub. (1) shall be credited against any final settlement or judgment between the parties. Upon motion to the court in the absence of the jury and on submission of proper proof prior to entry of judgment on a verdict, the court shall apply the provisions of s. 895.045 and then shall reduce the amount of the damages so determined by the amount of the payments made. Any rights of contribution between joint tort-feasors shall be determined on the amount of the verdict prior to reduction because of a settlement or advance payment.

(4) The period fixed for the limitation for the commencement of actions shall be as provided by s. 893.12.

228

executive officer replied: "We did." Sizzler USA Franchise paid the $1.5 million. When asked what was Sizzler USA Franchise's understanding of what it was getting for its money, the chief executive officer replied: "We got a settlement."

¶ 78. The Advance Partial Payment agreement with the Kriefalls recited that Sizzler USA Franchise "desires to make an Advance Payment to the Kriefall Plaintiffs," and recited the basic facts of the outbreak (the Excel meat sold to the E&B Sizzler restaurant where the Kriefalls ate the contaminated food, and that Sizzler USA Franchise "expressly denie[s]" "liability and negligence" for the Kriefall's injuries). It then provided:

> Sizzler [USA Franchise] hereby agrees to pay the Kriefalls, pursuant to sec. 885.285, Wis. Stats., the sum of $1.5 million . . . and in the event that judgment is entered [in the action] in favor of the Kriefalls against Sizzler [USA Franchise], this payment shall be a credit, in addition to any other credits to which Sizzler [USA Franchise] is entitled, up to the amount of the payment of $2 million against any judgments the Kriefalls obtain against Sizzler [USA Franchise].

¶ 79. The Advance Partial Payment agreement also recited that if the Kriefalls did not prevail in their lawsuit against Sizzler USA Franchise, they could keep the $1.5 million nevertheless. It also recited that the money was intended as "a partial advance payment for legal damages sustained by the Kriefalls," and was "not a release of any cause of action of the Kriefalls or any partial cause of action of the Kriefalls and shall not be construed to be a release of any kind or nature."

¶ 80. Excel invokes the principle that a mere volunteer may not get equitable indemnity. *See Milwaukee Mut. Ins. Co. v. Priewe*, 118 Wis. 2d 318, 323, 348 N.W.2d

585, 587 (Ct. App. 1984) (" 'Indemnification shifts the entire loss from one person who has been compelled to pay it to another who on the basis of equitable principles should bear the loss.' ") (quoted source omitted) (payment made because of obligation imposed by insurance contract). But someone who pays because he or she *might* be liable, is not a volunteer. *Voge*, 181 Wis. 2d at 731, 512 N.W.2d at 751 (Insurer who was potentially liable is not a volunteer if it pays before the determination of liability.); *Perkins v. Worzala*, 31 Wis. 2d 634, 637–638, 143 N.W.2d 516, 518 (1966) (Insurance company that paid a non-party when its insured was "potentially liable" to the non-party was not "a mere volunteer," and the insurance company could, therefore, get indemnity from a 100%-negligent tortfeasor.).

¶ 81. It may be that the money Sizzler USA Franchise paid so that members of Brianna Kriefall's family could attend her funeral was voluntary largess. But, as evident from both the Advance Partial Payment agreement and Sizzler USA Franchise's potential liability, Sizzler USA Franchise paid the $1.5 million to buy a modicum of financial peace and not as unalloyed corporate charity. Accordingly, the trial court erred in rejecting Sizzler USA Franchise's equitable indemnity claim.

¶ 82. Excel also argues that if we should hold that Sizzler USA Franchise has an equitable-indemnity claim against Excel, the claim should be reduced by twenty-percent because Excel was only eighty-percent contributorily negligent. We disagree. As between Sizzler USA Franchise and Excel, Excel was one-hundred percent responsible; the eighty-percent/twenty-percent alloca-

tion of the causal negligence for the *E. coli*-contamination was between Excel and E&B.[27]

C. *Attorney Fees.*

¶ 83. Sizzler USA Franchise seeks the lawyer fees it spent defending itself in these *E. coli*-contamination matters. It contends that the trial court erred when it rejected Sizzler USA Franchise's request. Sizzler USA Franchise argues that Excel should be forced to reimburse Sizzler USA Franchise for its legal expenses because Excel's shipment of contaminated meat ensnared Sizzler USA Franchise in this litigation even though the jury found that Sizzler USA Franchise did nothing wrong. We disagree.

Courts in Wisconsin may direct a person or entity to pay another's attorney's fees only in limited circum-

---

[27] On page 31 of its brief responding to Sizzler USA Franchise's main appellate brief, Excel asserts: "Sizzler [USA Franchise] ultimately entered into a separate settlement with the Kriefalls and thus, pursuant to this express agreement with the Kriefalls, Sizzler [USA Franchise] forfeited its contractual set-off. (Exh 9067, 9068; A[ppendix]24–31)." This is not true; the cited documents are *not* settlement agreements between Sizzler USA Franchise and the Kriefalls, as Sizzler USA Franchise points out in its reply brief. We caution counsel for Excel, as we cautioned counsel for E&B, that justice can only be done under accepted legal principles if all parties to a dispute take care not to exaggerate or mislead. *See Wisconsin Natural Gas Co.*, 220 Wis. 2d at 19 n.3, 582 N.W.2d at 119 n.3 ("misleading statements in briefs" violate "SCR 20:3.3, which requires candor toward tribunals."). At the very least, counsel for Excel should have sent a letter to us and all other counsel either apologizing for the misstatement or, if the agreement Excel's brief describes exists, pointing to where it is in the Record. They have done neither. Further, counsel for Excel did not correct the misstatement during oral argument.

stances. This so-called "American rule" holds that "with the exception of those attorneys' fees incurred in third-party litigation caused by the party from whom fees are sought, attorneys' fees may not be awarded unless authorized by statute or by a contract between the parties."

*Community Care Organization of Milwaukee County, Inc. v. Evelyn O.*, 214 Wis. 2d 434, 437, 571 N.W.2d 700, 702 (Ct. App. 1997) (quoted source omitted). This statement of the law ultimately comes from *Weinhagen v. Hayes*, 179 Wis. 62, 66, 190 N.W. 1002, 1003 (1922), which explained that a rule that permitted a winning party to get his or her fees from the losing party would be antithetical to a system of open justice:

> To hold otherwise would be to open the door to oppression and extortion, to penalize persons who appeal to the courts to adjudicate their differences. It would not be in accord with sound, public policy. The temptation to institute litigation for the purpose of recovering from the opposite party generous fees would be very great and no doubt lead to great abuses.

*Id.*, 179 Wis. at 66, 190 N.W. at 1003–1004. Sizzler USA Franchise's enmeshment in this lawsuit was not as someone collateral to the dispute of others, from whom Sizzler USA Franchise seeks its legal expenses, any more than a driver in a chain-reaction collision is collateral to the dispute between the injured plaintiff and those whom the plaintiff contends negligently caused his or her injuries, even though that driver is ultimately determined to be without fault. We affirm the trial court's refusal to let Sizzler USA Franchise recover its legal expenses from Excel.

## IV.

## (Conclusion)

¶ 84. We affirm the judgments and orders except: (1) We reverse the trial court's order permitting E&B and Secura to recover from Excel the money Federal Insurance paid to Secura; and (2) We reverse the trial court's order rejecting Sizzler USA Franchise's equitable indemnity claim against Excel.

*By the Court.*—Judgments and orders affirmed in part and reversed in part.